1   Evan R. Chesler (*pro hac vice* forthcoming)
    (N.Y. Bar No. 1475722)
2   echesler@cravath.com
    CRAVATH, SWAINE & MOORE LLP
3   825 Eighth Avenue
    New York, NY 10019
4   Telephone:  (212) 474-1000
    Facsimile:  (212) 474-3700
5
    David A. Nelson (*pro hac vice* forthcoming)
6   (Ill. Bar No. 6209623)
    davenelson@quinnemanuel.com
7   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    500 West Madison St., Suite 2450
8   Chicago, Illinois 60661
    Telephone:  (312) 705-7400
9   Facsimile:  (312) 705-7401

10  Karen P. Hewitt (SBN 145309)
    kphewitt@jonesday.com
11  JONES DAY
    4655 Executive Drive, Suite 1500
12  San Diego, California 92121
    Telephone:  (858) 314-1200
13  Facsimile:  (858) 345-3178

14  [*Additional counsel identified on signature page*]

15  *Attorneys for Plaintiff*
    QUALCOMM INCORPORATED
16

17

18              **UNITED STATES DISTRICT COURT**

19            **SOUTHERN DISTRICT OF CALIFORNIA**

20  QUALCOMM INCORPORATED,          Case No. **'17 CV 1010 WQH JMA**

21          Plaintiff,                **QUALCOMM**
                                      **INCORPORATED'S**
22      v.                           **REDACTED COMPLAINT**
                                      **FOR INJUNCTIVE RELIEF,**
23  COMPAL ELECTRONICS, INC.,        **SPECIFIC PERFORMANCE,**
    FIH MOBILE LTD., HON HAI         **DECLARATORY RELIEF,**
24  PRECISION INDUSTRY CO.,          **AND DAMAGES**
    LTD, PEGATRON
25  CORPORATION, and                 **DEMAND FOR JURY TRIAL**
    WISTRON CORPORATION,
26

27

28          Defendants.

QUALCOMM'S COMPLAINT

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................. 1

PARTIES ............................................................................................. 7

JURISDICTION AND VENUE ............................................................ 9

FACTUAL ALLEGATIONS ................................................................ 9

I.      Qualcomm's Innovation and Patent Portfolio................................. 9

II.     Qualcomm Has Long-Standing Agreements with Each Defendant. ............. 11

        A.      Qualcomm's License Agreement with Compal.................................. 12

        B.      Qualcomm's License Agreement with Foxconn. ............................... 13

        C.      Qualcomm's License Agreement with Wistron................................. 14

        D.      Qualcomm's License Agreement with Pegatron. .............................. 15

        E.      Defendants' Master Software Agreements with Qualcomm. ............. 16

III.    Until Recently, Defendants Consistently Paid Their Royalties Under Their License Agreements. ................................................. 16

        A.      Defendants Have Manufactured Non-Apple Products for Years. ....... 16

        B.      Apple Entered the Cellular Market and Enlisted Defendants To Manufacture Apple Products. .............................. 17

        C.      Defendants Consistently Made Royalty Payments Under Their License Agreements for Apple and Non-Apple Products. ................. 19

IV.     Defendants Have Withheld at Apple's Direction Substantial Royalty Payments That They Owe to Qualcomm. ........................... 20

        A.      Certain Defendants Failed To Pay Certain Royalties Due for the Fourth Quarter of 2016. ......................................... 20

        B.      Defendants Now Refuse To Pay Any Royalties for Apple Products. . 23

V.      Defendants Have Breached Their Agreements with Qualcomm. .................. 26

        A.      Defendants Breached Their License Agreements by Failing To Pay The Royalties They Owe. ............................ 26

        B.      Defendants Have Breached Their Audit Obligations Under Their License Agreements. .......................................... 27

       C.     Defendants Have Breached Their Reporting Obligations Under Their License Agreements. ................................................... 28

       D.     Defendants Breached Their Master Software Agreements. ............... 29

COUNT I

Foxconn's Breach of Its License Agreement ........................................... 30

COUNT II

Foxconn's Breach of Its Master Software Agreement ............................. 33

COUNT III

Pegatron's Breach of Its License Agreement .......................................... 34

COUNT IV

Pegatron's Breach of Its Master Software Agreement ............................. 38

COUNT V

Wistron's Breach of Its License Agreement ............................................ 39

COUNT VI

Wistron's Breach of Its Master Software Agreement .............................. 42

COUNT VII

Compal's Breach of Its License Agreement ............................................ 43

COUNT VIII

Compal's Breach of Its Master Software Agreement .............................. 46

COUNT IX

Declaratory Relief .................................................................................... 47

DEMAND FOR JURY TRIAL ................................................................. 48

PRAYER FOR RELIEF ............................................................................ 48

Plaintiff Qualcomm Incorporated ("Qualcomm"),[1] by its undersigned counsel, brings this Complaint against FIH Mobile Ltd. and Hon Hai Precision Industry Co., Ltd., (together, "Foxconn"), Pegatron Corporation, Wistron Corporation, and Compal Electronics, Inc. (collectively, "Defendants"), and alleges, with knowledge with respect to its own acts and on information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      Each Defendant has a long-term, enforceable license agreement with Qualcomm.  Those license agreements grant Defendants certain rights to Qualcomm intellectual property in exchange for quarterly royalty payments to Qualcomm.  Defendants recently breached those license agreements by withholding more than ▮▮▮▮▮ in royalty payments that they undisputedly owe Qualcomm.  Moreover, Defendants have made clear that they will continue to breach their license agreements by withholding substantial royalty payments from Qualcomm for the indefinite future.  Qualcomm brings this action for breach of contract, seeking injunctive relief, specific performance, declaratory relief, and damages.

2.      For many years, Defendants have consistently paid royalties to Qualcomm under their license agreements.  Since the start of 2017, however, Apple Inc. ("Apple") has interfered with Defendants' long-standing payment obligations to Qualcomm.  Specifically, Apple has withheld substantial payments from Defendants that it owes for Qualcomm royalties and has directed Defendants not to make corresponding royalty payments to Qualcomm.  Although Defendants are

---

[1] Qualcomm Incorporated is the parent company.  One division of Qualcomm Incorporated is Qualcomm Technology Licensing ("QTL"), which grants licenses or otherwise provides rights to use portions of Qualcomm Incorporated's intellectual property portfolio.  Qualcomm Incorporated's separate subsidiary, Qualcomm Technologies, Inc. ("QTI"), operates substantially all of the products and services businesses owned by Qualcomm Incorporated, including Qualcomm CDMA Technologies ("QCT"), and substantially all of its engineering, research, and development functions.  For ease of reference only, in this Complaint, QTL, QTI, and QCT will be referred to herein as "Qualcomm".

independent companies, they have responded to Apple's recent conduct in exactly the same way: they have followed Apple's instruction and withheld from Qualcomm whatever amount Apple has withheld from them. That is a clear breach of Defendants' license agreements. Defendants have admitted that Apple is directing their breach, and Apple has admitted that it will continue to withhold Qualcomm royalties for the indefinite future. Apple has even agreed to indemnify Defendants for any damages they might incur from their blatant breaches.

3. Apple is attempting to inflict severe, immediate, and permanent harm on Qualcomm to force Qualcomm to agree to Apple's unreasonable demand for a below-market direct license. Having filed complaints around the world, Apple is now unwilling to wait for those cases to be litigated and is instead trying to force the result it seeks through the exertion of substantial unlawful commercial pressure.

4. But Apple's unlawful tactics do not excuse Defendants' failure to pay Qualcomm the royalties they owe for Apple products. Defendants know this. They have consistently paid Qualcomm royalties since the first license agreement was entered into *nearly 17 years ago* and, tellingly, *continue to pay Qualcomm royalties for non-Apple products*, under the very same agreements that govern the Apple products. There is no excuse for Defendants' breaches.

5. Qualcomm is the world's leading innovator of cellular communications technology. It has spent three decades designing, developing, and improving mobile communication systems and networks. Due to its groundbreaking inventions, Qualcomm now owns thousands of patents that are technically essential to various cellular standards (cellular standard-essential patents, or "cellular SEPs"), including 3G and 4G LTE. Qualcomm also owns thousands of patents that, although not technically essential to a cellular standard, are essential to other industry standards ("non-cellular SEPs") or are not technically essential to any industry standard (non-standard-essential patents, or "NEPs") but provide important functionality to cellular products and systems. Together,

1  Qualcomm's inventions form the very core of modern cellular communications.
2  Every modern cell phone practices multiple Qualcomm patents.

3      6.    For many years, Qualcomm has licensed its patents to cellular device
4  manufacturers.  Due to the fundamental nature of Qualcomm's inventions, virtually
5  every handset supplier in the world—or the manufacturers from which those
6  suppliers source their products—has entered into a royalty-bearing license to
7  Qualcomm patents, all on terms that reflect the established market value of
8  Qualcomm's vast patent portfolio.

9      7.    Defendants are four such manufacturers of consumer electronics.
10  Each Defendant manufactures wireless products (phones and/or tablets) that comply
11  with 3G and 4G LTE cellular standards.  Each Defendant manufactures products
12  that necessarily practice thousands of Qualcomm's patents.  Thus, to avoid
13  infringing Qualcomm's intellectual property, each Defendant needs—and long ago
14  entered into—a license with Qualcomm.

15      8.    Each Defendant entered into a license agreement with Qualcomm
16  voluntarily and following arm's-length negotiations.  Defendants entered into the
17  applicable license agreements with Qualcomm on the following dates:

18            &bull;   <u>Compal</u>:  February 10, 2000
19            &bull;   <u>Foxconn</u>:  October 18, 2005
20            &bull;   <u>Wistron</u>:  May 23, 2007
21            &bull;   <u>Pegatron</u>:  April 29, 2010

22      9.    The agreements (collectively, the "License Agreements") are
23  straightforward and unambiguous.  In exchange for consideration including
24  quarterly royalty payments to Qualcomm (calculated as a percentage of the net
25  selling price, or NSP, of each product sold by Defendants), Qualcomm grants
26  Defendants the right to use certain Qualcomm intellectual property to manufacture
27  and sell cellular products.

28

10.    Defendants do not sell many of their products to consumers under their own brands; rather, they sell the vast majority of their products to other companies that brand and then resell the products to consumers.  Since entering into their License Agreements, Defendants have manufactured cellular devices for many of the world's leading sellers of cellular phones and tablets, such as ███████.

11.    Each Defendant also manufactures cellular devices for Apple.  Apple is the largest customer of each Defendant with respect to sales made under its License Agreement, and collectively, Defendants manufacture for Apple virtually every iPhone and iPad sold worldwide today.  Foxconn began making and selling iPhones (and later iPads) to Apple in 2007; Pegatron began making and selling iPhones to Apple in 2011; and both Wistron and Compal began making and selling products (iPhones by Wistron; iPads by Compal) to Apple in 2014.

12.    Defendants are obligated to pay royalties to Qualcomm on both Apple and non-Apple products alike.  The same License Agreements, with the same terms, apply to Apple and non-Apple products.  And Defendants have, in fact, paid royalties to Qualcomm under their License Agreements for many years—Compal has paid for 15 years; Foxconn for 11 years; Pegatron for 7 years; and Wistron for 3 years.  Until recently, Defendants consistently paid quarterly royalties on both Apple and non-Apple products.

13.    Since the start of 2017, however, Defendants have failed to pay more than ███████ in royalties that they *admittedly* owe Qualcomm based on their sales of Apple products.  In doing so, Defendants have breached, and are continuing to breach, their License Agreements.

14.    With respect to Q4 2016 royalties, Apple claimed that Qualcomm owed nearly ███████ dollars to Apple under an agreement not involving Defendants (known as the Business Cooperation and Patent Agreement, or "Cooperation Agreement").  Engaging in self-help, Apple withheld from Defendants ███████████████████.  Defendants

then withheld from Qualcomm ████████████ in their respective Q4 2016 royalty payments. That was a clear breach of the License Agreements.

15.    In fact, according to Defendants' own royalty reports, Defendants collectively withheld nearly ████████ in Q4 2016 royalties that they owe Qualcomm under their License Agreements. Foxconn certified that it owed Qualcomm approximately ████████ for its Q4 2016 sales of iPhones, but it withheld from Qualcomm more than ████████ of that amount. Similarly, Pegatron withheld more than ████████ of its Q4 2016 reported royalties for Apple products, and Wistron withheld more than ████████ for Apple products.[2] By contrast, each Defendant paid the full amount of its reported royalties for Q4 2016 sales of non-Apple products.

16.    Defendants' breaches of their License Agreements continued and expanded with respect to their Q1 2017 royalty payments. Whereas Defendants made at least partial payments for their Q4 2016 royalties for Apple products—withholding ████████████████████████████ ████—Defendants withheld *all* royalties due on Apple products for Q1 2017. Defendants have collectively withheld nearly ████████ in Q1 2017 royalties for Apple products that they owe Qualcomm. For example, Foxconn certified that it "sold ████████ [iPhones], and owes ████████████ in royalties to QUALCOMM for these [Q1 2017] sales"; however, Foxconn refused to pay *any* royalties on those products. Similarly, for Q1 2017 sales of Apple products, Pegatron has withheld all of the royalties it owes, approximately ████████; and Compal has withheld more than ████████ in royalties. Wistron failed even to report to Qualcomm ████████ it owes in Apple royalties. Notably, Defendants have paid, or confirmed that they will pay, all reported Q1 2017 royalties on *non-Apple* products.

_____

[2] Based on its reported sales data, Compal paid its full royalties for Q4 2016, having received full payment from Apple (unlike the other Defendants).

17.     The License Agreements are valid and enforceable contracts and Defendants are required to pay royalties based on the sales of Apple and non-Apple products under the terms of those agreements.  Defendants have effectively conceded as much by (i) consistently paying royalties under their License Agreements during the past decade (or longer); (ii) continuing to pay royalties under their License Agreements on the sale of non-Apple products, including for Q4 2016 and Q1 2017; (iii) paying some of what they owe even for Apple products for Q4 2016 (which, although itself a breach, demonstrates that Defendants have no justification for now refusing to pay Apple royalties at all); and (iv) certifying in royalty reports for Q4 2016 and Q1 2017 that they owe Qualcomm full royalties for Apple and non-Apple products.  By failing to pay the royalties they owe to Qualcomm, Defendants have breached their License Agreements and injured Qualcomm.

18.     Apple has told Qualcomm that it will not make any further royalty payments to Defendants until the litigation between Apple and Qualcomm is resolved.  There is no way to know how long that will be.  But Apple's strong-arm tactics, while unethical and unlawful, ***are not an excuse or justification*** for Defendants to fail to comply with the terms of their agreements with Qualcomm.  Yet Defendants have done just that—they refuse to pay royalties to Qualcomm if they are not receiving payments from Apple.  That is a breach of their License Agreements, and Defendants have made clear that such conduct will continue so long as Apple refuses to pay.  And Apple has made clear that it will not resume its payments.  Accordingly, Qualcomm will continue to be substantially injured by Defendants' breaches of their agreements each quarter going forward for an indefinite period of time.

19.     Separately, Defendants have breached their License Agreements with respect to Qualcomm's audit rights and the calculation of royalties.  *First*, with respect to Apple products, Defendants have repeatedly refused to provide

1  independent auditors with the necessary information required to conduct audits,

2  including information Defendants routinely provide for non-Apple products.

3  *Second*, Defendants have failed to accurately report sales information (which is

4  used to compute royalties) on products they have manufactured and sold, in order to

5  underpay royalties owed under their License Agreements.

6      20.   █████████████████████████, Defendants also breached their

7  software agreements ("Master Software Agreements" or "MSAs") with Qualcomm.

8  Defendants have been granted rights to use Qualcomm's copyrighted software, ███

9  ██████████████████████████████████████████████

10 ████████████████████████████████

11 █████████████████████████████████

12 ██████████████████████████████████████

13 █████████████████████████████████████

14 ██████████████████████████████████████

15 ████████  Defendants have materially breached their Master Software Agreements

16 with Qualcomm.

17     21.   Qualcomm brings these claims to enforce its contractual rights, to

18 receive fair value for the use of its intellectual property, and to seek redress for

19 Defendants' breaches of the License Agreements and the Master Software

20 Agreements.  Qualcomm seeks injunctive relief, specific performance, declaratory

21 relief, compensatory and consequential damages, and attorneys' fees.

22 **PARTIES**

23     22.   Qualcomm is a Delaware corporation with its principal place of

24 business at 5775 Morehouse Drive, San Diego, California.  Qualcomm is

25 recognized as an industry leader and innovator in the field of wireless technologies.

26 Qualcomm has more than 130,000 patents and patent applications around the world

27 relating to cellular technologies and other cutting-edge technologies.  Qualcomm

28 derives a substantial portion of its revenues and profits from licensing its

intellectual property.  Qualcomm has developed technologies enabling 2G, 3G, and 4G LTE cellular standards for mobile devices.  Qualcomm owns thousands of patents around the world relating to each of these technologies, and is a leader in developing forthcoming 5G technologies.  Qualcomm, through its subsidiary, QTI, also supplies chips, chipsets, and associated software for mobile phones and other cellular products.

23.    Hon Hai Precision Industry Co., Ltd. ("Hon Hai") is a corporation organized and existing under the laws of Taiwan, with its principal place of business at No. 66, Zhongshan Road, Tucheng Industrial Zone, Tucheng Dist., New Taipei City, Taiwan, R.O.C.  Hon Hai manufactures and sells throughout the world a wide range of products, including cellular products that implement various families of cellular standards.

24.    FIH Mobile Ltd. (formerly Foxconn International Holdings Ltd.) ("FIH") is a corporation organized and existing under the laws of the Cayman Islands, with its principal place of business at 18 Youyi Road, Langfang Economic and Technological Development Zone, Hebei Province, People's Republic of China.  FIH Mobile Ltd. is a subsidiary of Hon Hai Precision Industry Co., Ltd. and manufactures and sells throughout the world a wide range of products, including cellular products that implement various families of cellular standards.

25.    Pegatron Corporation ("Pegatron") is a corporation organized and existing under the laws of Taiwan, with its principal place of business at 5F, No. 76, Ligong Street, Beitou District, Taipei City 112, Taiwan, R.O.C.  Pegatron manufactures and sells throughout the world a wide range of products, including cellular products that implement various families of cellular standards.

26.    Wistron Corporation ("Wistron") is a corporation organized and existing under the laws of Taiwan, with its principal place of business at 21F, 88, Section 1, Hsin Tai Wu Road, Hsichih, Taipei Hsien 221, Taiwan, R.O.C.  Wistron

1 manufactures and sells throughout the world a wide range of products, including

2 cellular products that implement various families of cellular standards.

3        27.     Compal Electronics, Inc. ("Compal") is a corporation organized and

4 existing under the laws of Taiwan, with its principal place of business at Nos. 581

5 & 581-1, Ruiguang Road, Neihu District, Taipei City, 11492, Taiwan, R.O.C.

6 Compal manufactures and sells throughout the world a wide range of products,

7 including cellular products that implement various families of cellular standards.

8                            **JURISDICTION AND VENUE**

9        28.     This Court has jurisdiction over the subject matter of this action

10 pursuant to 28 U.S.C. § 1332(a)(2), and Qualcomm seeks declaratory relief

11 pursuant to 28 U.S.C. §§ 2201(a) and 2202.

12       29.     This Court has personal jurisdiction over Defendants because

13 Defendants' actions could be expected to harm, and have caused harm to,

14 Qualcomm in California.  Further, the contracts sued upon herein, which were made

15 and entered into in the State of California, provide for adjudication of disputes in a

16 court of competent jurisdiction located in the county of San Diego, State of

17 California.  In addition, those contracts contain California choice-of-law provisions.

18       30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)

19 because a substantial part of the events and omissions giving rise to the claims

20 occurred in San Diego County in this Judicial District.  In addition, the contracts

21 sued upon herein provide for adjudication of disputes and venue in a court of

22 competent jurisdiction located in the county of San Diego, State of California.

23                            **FACTUAL ALLEGATIONS**

24 **I.     Qualcomm's Innovation and Patent Portfolio.**

25       31.     Qualcomm is the world's leading innovator of cellular technology.

26 Its inventions form the very core of modern cellular communications.  No company

27 has done more to develop the technology that enables cellular networks and

28

systems, and no company does more today to create and improve that technology for the next generation.

32.     Since its founding in 1985, Qualcomm has invested more than $43 billion in R&D to create and expand innovative technologies for cell phones and other wireless products.  As a result of Qualcomm's investment in innovation, Qualcomm owns the world's most valuable patent portfolio with respect to all modern cellular standards.  That portfolio currently includes more than 130,000 issued patents and patent applications worldwide.  No company can match the breadth, quality, or value of Qualcomm's cellular patent portfolio.

33.     Hundreds of cellular device suppliers around the world have entered into licenses with Qualcomm—or have sourced their products from a manufacturer that has a license with Qualcomm—all on terms that reflect the established market value of Qualcomm's patent portfolio.

34.     Qualcomm's patented innovative technologies enable all aspects of mobile computing and cellular communication, including allowing greater broadband speeds, more reliable connectivity, and increased system capacity. In addition, Qualcomm has improved data transfer rates, increased spectrum use efficiency, expanded system capacity, lowered power consumption, and improved the interoperability among 2G, 3G, and 4G cellular technologies and other wireless communication technologies, such as Wi-Fi and Bluetooth.

35.     Qualcomm's patents cover fundamental inventions in both standard-essential and non-standard-essential cellular technologies.

36.     A patent is considered "essential" to a standard when an aspect of the standard cannot, as a technical matter, be implemented without practicing at least one claim in the patent.  Such patents are called standard-essential patents, or SEPs.

37.     A non-standard-essential patent, or NEP, is not technically necessary to practice any feature of a standard.  But a NEP may cover an invention that

1  provides important functionality and value to cellular devices or systems and may

2  be highly desired by consumers, cellular product manufacturers, or suppliers.

3         38.     Qualcomm chose to contribute technologies to standard-development

4  organizations, patent its inventions, and voluntarily license its patents to

5  manufacturers of cellular standard-compliant devices.  As a result, companies have

6  been able to use Qualcomm's technology to create the products and experiences

7  that consumers enjoy today.  Qualcomm, through its licensing division, QTL,

8  currently has license agreements with hundreds of companies covering 3G and 4G

9  cellular technologies and products.  Defendants are among those companies.

10        39.     In addition to its patent licensing business, Qualcomm also supplies

11  chips and related software used in cellular devices.  Qualcomm's subsidiary

12  QTI designs and sells a variety of chips for use in cellular (or other computing)

13  products.  Beginning with an iPhone model released in 2011, Defendants have

14  purchased Qualcomm chips for use in Apple's products.  Defendants have also

15  purchased Qualcomm chips for use in manufacturing products for other customers

16  besides Apple.

17        40.     Handset manufacturers that utilize Qualcomm's chips separately enter

18  into copyright licenses through software agreements with Qualcomm to use

19  Qualcomm's cutting-edge software that runs or controls the operation of its chips.

20  **II.    Qualcomm Has Long-Standing Agreements with Each Defendant.**

21        41.     Qualcomm began entering into the License Agreements with

22  Defendants nearly two decades ago.  Defendants have enjoyed the benefits of those

23  agreements for years; Qualcomm's licensed technology has been integral to the

24  success of the cellular products they manufacture, including Apple's iPhones and

25  iPads.  Absent Defendants' License Agreements, the cellular products they

26  manufacture (for Apple and others) would infringe many thousands of patents in

27  Qualcomm's portfolio.

28

1

**A.    Qualcomm's License Agreement with Compal.**

2      42.    On February 10, 2000, Compal and Qualcomm entered into a License

3   Agreement ("Compal License Agreement").  The Compal License Agreement

4   grants Compal the right to manufacture and sell Subscriber Units (cellular devices)

5   that incorporate certain Qualcomm intellectual property.  The Compal License

6   Agreement ███████████████████████████████████████████.

7      43.    The License Agreement grants Compal rights to certain patents owned

8   by Qualcomm, including both SEPs and NEPs.  Compal is licensed to practice

9   ████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ██████████████████████████████

15     44.    In exchange for access to Qualcomm's intellectual property, Compal

16  agreed to make upfront payments to Qualcomm and to pay Qualcomm per-product

17  royalties on a quarterly basis.  Compal's royalties are calculated as a percentage of

18  the Net Selling Price, or NSP (as defined in the Compal License Agreement) for

19  each product during the relevant calendar quarter.  Compal also agreed, among

20  other things, to report its quarterly sales data, including the units sold and selling

21  price, to Qualcomm.  Compal also committed to keep accurate books and records of

22  its quarterly sales and to permit independent auditors to conduct regular audits of

23  those records.

24     45.    Qualcomm and Compal have executed various amendments to the

25  Compal License Agreement, including on:  March 12, 2002; November 4, 2002;

26  February 1, 2006; June 22, 2007; April 15, 2008; and February 27, 2014.  At all

27  times since February 10, 2000, the Compal License Agreement has been an

28

1  enforceable contract, and Compal has had royalty payment and other obligations

2  under the contract.

3  **B.   Qualcomm's License Agreement with Foxconn.**

4  46.   On October 18, 2005, Foxconn and Qualcomm entered into a License

5  Agreement ("Foxconn License Agreement").[3]  The Foxconn License Agreement

6  grants Foxconn the right to manufacture and sell Subscriber Units that incorporate

7  certain Qualcomm intellectual property.  The Foxconn License Agreement

8  ██████████████████████████████████████████████████████████.

9  47.   The License Agreement grants Foxconn rights to certain patents

10  owned by Qualcomm, including both SEPs and NEPs.  Foxconn is licensed to

11  practice ████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████.

17  48.   In exchange for access to Qualcomm's intellectual property, Foxconn

18  agreed to make upfront payments to Qualcomm and to pay Qualcomm per-product

19  royalties on a quarterly basis.  Foxconn's royalties are calculated as a percentage of

20  NSP (as defined in the Foxconn License Agreement) for each product sold during

21  the relevant calendar quarter.  Foxconn also agreed, among other things, to report

22  its quarterly sales data, including the units sold and selling price, to Qualcomm.

23

24  ───────────────────
   [3] Qualcomm and FIH Mobile Ltd. (formerly Foxconn International Holdings
25  Ltd.) entered into the Foxconn License Agreement on October 18, 2005.  Hon Hai
   also signed the License Agreement with respect to two sections.  That same day,
26  Qualcomm, FIH, and Hon Hai entered into a separate agreement making Hon Hai a
   sublicensee under the Foxconn License Agreement and agreeing that ███████████
27  ████████████████████████████████████████████████████████

28

1  Foxconn also committed to keep accurate books and records of its quarterly sales
2  and to permit independent auditors to conduct regular audits of those records.

3    49.   Qualcomm and Foxconn executed various amendments to the Foxconn
4  License Agreement, including on:  March 27, 2006; November 29, 2007 (since
5  terminated); April 14, 2009; and September 24, 2012.  At all times since October
6  18, 2005, the Foxconn License Agreement has been an enforceable contract, and
7  Foxconn has had royalty payment and other obligations under the contract.

8              **C.    Qualcomm's License Agreement with Wistron.**

9    50.   On May 23, 2007, Wistron and Qualcomm entered into a License
10  Agreement ("Wistron License Agreement").  The Wistron License Agreement
11  grants Wistron the right to manufacture and sell Subscriber Units that incorporate
12  certain Qualcomm intellectual property.  The Wistron License Agreement ███████
13  ██████████████████████████████████████████

14    51.   The License Agreement grants Wistron rights to certain patents owned
15  by Qualcomm, including both SEPs and NEPs.  Wistron is licensed to practice
16  ████████████████████████████████████████████████
17  ████████████████████████████████████████████████
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████████████████████████████████████████████
21  ████████████████████████████████████

22    52.   In exchange for access to Qualcomm's intellectual property, Wistron
23  agreed to make upfront payments to Qualcomm and to pay Qualcomm per-product
24  royalties on a quarterly basis.  Wistron's royalties are calculated as a percentage of
25  NSP (as defined in the Wistron License Agreement) for each product sold during
26  the relevant calendar quarter.  Wistron also agreed, among other things, to report its
27  quarterly sales data, including the units sold and selling price, to Qualcomm.

28

1  Wistron also committed to keep accurate books and records of its quarterly sales
2  and to permit independent auditors to conduct regular audits of those records.

3      53.    At all times since May 23, 2007, the Wistron License Agreement has
4  been an enforceable contract, and Wistron has had royalty payment and other
5  obligations under the contract.

6          **D.    Qualcomm's License Agreement with Pegatron.**

7      54.    On April 29, 2010, Pegatron and Qualcomm entered into a License
8  Agreement ("Pegatron License Agreement").  The Pegatron License Agreement
9  grants Pegatron the right to manufacture and sell Subscriber Units that incorporate
10 certain Qualcomm intellectual property.  The Pegatron License Agreement
11 ████████████████████████████████

12     55.    The License Agreement grants Pegatron rights to certain patents
13 owned by Qualcomm, including both SEPs and NEPs.  Pegatron is licensed to
14 practice ██████████████████████████████████████
15 ████████████████████████████████████████████
16 ████████████████████████████████████████
17 ████████████████████████████████████████████
18 ████████████████████████████

19     56.    In exchange for access to Qualcomm's intellectual property, Pegatron
20 agreed to make upfront payments to Qualcomm and to pay Qualcomm per-product
21 royalties on a quarterly basis.  Pegatron's royalties are calculated as a percentage of
22 NSP (as defined in the Pegatron License Agreement) for each product sold during
23 the relevant calendar quarter.  Pegatron also agreed, among other things, to report
24 its quarterly sales data, including the units sold and selling price, to Qualcomm.
25 Pegatron also committed to keep accurate books and records of its quarterly sales
26 and to permit independent auditors to conduct regular audits of those records.

27     57.    Qualcomm and Pegatron executed various amendments to the
28 Pegatron License Agreement, including on:  June 1, 2010 (two amendments);

June 30, 2010; and May 23, 2011 (since terminated).  At all times since April 29, 2010, the Pegatron License Agreement has been an enforceable contract, and Pegatron has had royalty payment and other obligations under the contract.

        **E.**    **Defendants' Master Software Agreements with Qualcomm.**

58.    In addition to entering into a License Agreement with Qualcomm, each Defendant, at Apple's direction, also has purchased chips from Qualcomm.  Apple first selected Qualcomm chips for use in a model of its fourth-generation iPhone that was released in 2011.  Each Defendant entered into a separate (non-patent) license agreement with Qualcomm in 2010, which granted each Defendant certain rights to use Qualcomm's copyrighted software with Qualcomm chips.  Each Master Software Agreement, or MSA, also contemplates that Defendants will enter into software addenda for specific software products, which they have done on a number of occasions since 2010.  ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

## III.   Until Recently, Defendants Consistently Paid Their Royalties Under Their License Agreements.

59.    For many years, Defendants have enjoyed the benefits of the License Agreements and paid royalties under those Agreements, for both non-Apple and Apple products.

        **A.**    **Defendants Have Manufactured Non-Apple Products for Years.**

60.    Defendants have long been leading manufacturers of a vast array of electronic products, including cell phones, tablets, e-readers, televisions, personal computers, game consoles, and networking equipment.  For many years, Compal, Foxconn, Pegatron, and Wistron each has manufactured cellular products for

1  numerous electronics companies other than Apple, and has done so under its
2  License Agreements with Qualcomm.

3       61.    Compal began making and selling cellular products under its License
4  Agreement in 2002.  Over the past 15 years, Compal has manufactured products
5  under its License Agreement for ███████████████████████████████████,
6  among other companies.  Today, Compal continues to manufacture non-Apple
7  products under its License Agreement.

8       62.    Foxconn entered into its License Agreement in 2005 and soon began
9  making and selling products to ████, among others, under its License Agreement.
10  Over the past 12 years, Foxconn has manufactured products under its License
11  Agreement for more than 250 companies, including ███████████████████████
12  ██████████████████████████.  Today, Foxconn continues to
13  manufacture non-Apple products under its License Agreement.

14       63.    Pegatron began making and selling products under its License
15  Agreement in 2010 to ████, among others.  Over the past seven years, Pegatron has
16  manufactured products under its License Agreement for ███████████████████
17  ████, among other companies.  Today, Pegatron continues to manufacture non-
18  Apple products under its License Agreement.

19       64.    Wistron began making and selling products under its License
20  Agreement in 2013 to ████.  Wistron also has made products under its License
21  Agreement for ████, among others.  Today, Wistron continues to manufacture non-
22  Apple products under its License Agreement.

23                **B.    Apple Entered the Cellular Market and Enlisted Defendants
24                         To Manufacture Apple Products.**

25       65.    Although Apple is now the world's most profitable seller of cellular
26  products, it was a late-comer to the cellular industry.  When Apple sought to
27  commercialize the first 3G iPhone in 2008, it chose not to enter into a direct license
28  with Qualcomm, though Qualcomm always has been willing to negotiate a direct

license with Apple and has on numerous occasions discussed a direct license with Apple.  Instead, Apple outsourced the manufacturing of its iPhones and iPads to Defendants, relying on Defendants' existing License Agreements with Qualcomm to gain access to valuable cellular technology.

66.     It was through this arrangement that each of the Defendants ultimately started manufacturing products for Apple.  Under their respective License Agreements with Qualcomm, Defendants have manufactured and (until recently) paid royalties on Apple products for years:  Foxconn since 2008; Pegatron since 2011; Wistron since early 2014; and Compal since mid-2014.  Apple has historically advanced payment to Defendants for the royalties they owed to Qualcomm on Apple products, and Defendants then remitted those payments to Qualcomm.

67.     A later model of Apple's fourth-generation iPhone, released in 2011, was the first Apple product to utilize Qualcomm chips.  At that time, Defendants—at Apple's direction—began purchasing chips (and licensing associated software) developed by Qualcomm's chip business, QCT.  QCT faced fierce competition for that supply.  In 2015, as part of its updated chip supply agreement, ████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ ████████████████████████████████████████████

████████████████████████████████████████████████

—————————————————————

[4] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**C. Defendants Consistently Made Royalty Payments Under Their License Agreements for Apple and Non-Apple Products.**

68.     For many years, Defendants consistently paid royalties under their License Agreements.

69.     █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████

70.     Each quarter, Defendants are required to send Qualcomm a royalty report setting forth the amount of royalties owed for that quarter.

71.     Defendants' payment obligations do not depend on the supplier to which the product will be sold (Apple or non-Apple). Compal sold non-Apple products under the terms of its License Agreement 12 years before selling licensed products to Apple. Foxconn sold non-Apple products under the terms of its License Agreement for three years before selling licensed products to Apple. Pegatron and Wistron sold non-Apple products under the terms of their License Agreements several months before selling licensed products to Apple. The material terms of the License Agreements remained consistent before and after each Defendant began manufacturing Apple products.

72.     Defendants' payment obligations also do not depend on whether the manufactured product uses a Qualcomm chip or software. Indeed, each of the License Agreements was entered into prior to the first use of Qualcomm chips or software in any Apple product in 2011.

73.     Year after year, customer after customer, and product model after product model, Defendants have paid for the use of Qualcomm's technology under their License Agreements.

74.     This year, however, for the first time, Defendants have stopped paying the royalties they have reported for Apple products.

## IV.   Defendants Have Withheld at Apple's Direction Substantial Royalty Payments That They Owe to Qualcomm.

75.     Apple no longer wishes to pay fair value for Qualcomm's technology, and it has involved Defendants in its scheme to coerce below-market royalty rates out of Qualcomm.

76.     Apple is withholding substantial payments from Defendants and directing them not to make corresponding royalty payments to Qualcomm.  By cutting off nearly ▮▮▮▮▮▮▮ in royalty payments, on average, every calendar quarter for the indefinite future, Apple's goal is clear:  to cause Qualcomm so much harm that Qualcomm will be forced to capitulate to the unfair licensing terms that Apple is demanding.

77.     In accordance with Apple's plan, Defendants have withheld more than ▮▮▮▮▮ in royalties owed to Qualcomm for Q4 2016 and Q1 2017 sales of Apple products.  Meanwhile, Defendants continue to collect billions of dollars in revenues from Apple based on sales of Qualcomm-enabled cellular products, and Apple continues to collect billions more from consumers.

### A.   Certain Defendants Failed To Pay Certain Royalties Due for the Fourth Quarter of 2016.

78.     On January 20, 2017, Apple filed a lawsuit against Qualcomm in the U.S. District Court for the Southern District of California, alleging that Qualcomm owes payments under the Cooperation Agreement between Apple and Qualcomm, among other claims.  Apple has also filed lawsuits against Qualcomm in other jurisdictions around the world.  Those lawsuits are part of Apple's overall strategy

1   of attacking Qualcomm's business to avoid paying fair value for Qualcomm's

2   technology.

3       79.    In its January 20 complaint, Apple—the wealthiest company in the

4   world—claimed that it had "no choice" but to withhold from Defendants ███

5   ████████████████████████████████████████████████████████████

6   ████████.  Apple could have readily paid the amount due; it recently reported that

7   it has more than $256 billion in cash reserves.  Instead, for Q4 2016,

8   Apple underpaid royalties to Defendants by nearly ████████, and the Defendants

9   then withheld ████████████████ from Qualcomm.

10      80.    Foxconn's Q4 2016 royalty payment was due on January 30, 2017.

11  On January 21, 2017, Foxconn provided Qualcomm with its Q4 2016 iPhone

12  royalty report, certifying that it had "sold ████████ [iPhones], and owes

13  ████████████████████ in royalties to QUALCOMM for these sales".  Qualcomm

14  sent Foxconn an invoice for those reported royalties.

15      81.    Foxconn subsequently requested that Qualcomm "revise" its invoice

16  by dividing it into three separate invoices.  Following further correspondence,

17  Qualcomm submitted invoices for the following amounts to Foxconn: ████████████

18  (invoice 1); ████████████ (invoice 2); and ████████████ (invoice 3).

19  Qualcomm stated that Foxconn "owes the full amount even though we are sending

20  separate invoices, and Qualcomm expects Foxconn to pay the full amount of each

21  invoice."  Invoice 1 represented the amount due for Chinese customs, which

22  Foxconn paid.  As to invoices 2 and 3, Foxconn stated that it had received only

23  roughly one-third of the royalties due from Apple (the invoice 2 amount) and that

24  the remaining amount (invoice 3) would "not be issued".  As a result, for Q4 2016,

25  Foxconn withheld more than ████████████ in royalties that it admittedly owes

26  Qualcomm.  Foxconn paid the full amount of Q4 2016 royalties that it reported for

27  non-Apple products.

28

82.     Pegatron's Q4 2016 royalty payment was due on January 30, 2017. On January 22, 2017, Pegatron provided Qualcomm with its Q4 2016 iPhone royalty report.  The report showed that Pegatron owed ███████████ in royalties for Apple products, and Qualcomm invoiced Pegatron for that amount.  On February 6, 2017, Pegatron paid only ██████████ (including withholding tax) to Qualcomm for Apple products.  Qualcomm later reiterated that Pegatron is required to pay the full amount of royalties for Apple products, which Pegatron has failed to do.  Accordingly, for Q4 2016, Pegatron withheld ███████████ in royalties that it owes Qualcomm.  Pegatron paid the full amount of Q4 2016 royalties that it reported for non-Apple products.

83.     Wistron's Q4 2016 royalty payment was due on January 30, 2017, but it did not timely submit that report for Apple products.  Qualcomm had asked about the report on January 23 and received no response.  On February 4, 2017, Qualcomm reminded Wistron that its report and payment were due within 30 days of the end of the quarter.  Qualcomm again inquired about the royalty report.  On February 13, 2017, Wistron finally sent its royalty report, but the report was missing most of the required sales data for Apple products—information that Wistron had always provided in the past.  Wistron certified that it owed only ██████████ in royalties for Apple products.  But Apple itself contradicted that amount.  Based on Apple's estimate (the veracity of which Qualcomm is unable to verify), Wistron owed Qualcomm approximately ████████ in royalties for Q4 2016.  Qualcomm asked Wistron to provide complete and accurate sales information for Q4 2016, but Wistron told Qualcomm that the information it sent was all that its "customer" (Apple) "allowed [Wistron] to provide".  Wistron paid the full amount of Q4 2016 royalties that it reported for non-Apple products.

84.     Compal's Q4 2016 royalty payment was due on February 14, 2017, and Compal paid the full amount it reported for Apple and non-Apple products.

Unlike the other Defendants, Compal received full payment from Apple for Q4 2016 royalties.

85.    On February 3, 2017, Apple confirmed that it had withheld nearly ██████ from Defendants in Q4 2016 royalties.  On behalf of Apple, a senior Apple executive admitted that it was withholding ██████████ from Foxconn, ██████████ from Pegatron, and ██████████ from Wistron.

**B.    Defendants Now Refuse To Pay Any Royalties for Apple Products.**

86.    Royalty payments for Q1 2017 were due on ██████████ ████████████████████████████████████████████

87.    Certain Defendants initially indicated that they would comply with their License Agreements for Q1 2017.

88.    For example, on April 17, 2017, Foxconn certified that it had "sold ██████ [iPhones], and owes ██████████████ in royalties to QUALCOMM for these sales" and that "[t]he attached file represents an accurate and complete record of all royalty".  Foxconn also certified that it owed an additional ██████████ for Q1 2017 iPad sales.  At that time, Foxconn offered no indication that the royalties it admitted owing would not be paid in full.  On April 15, 2017, Pegatron reported that it owes Qualcomm ██████████ in Apple royalties for Q1 2017.  On April 19, 2017 Compal reported that it owes Qualcomm ██████ in Apple royalties for Q1 2017.  Wistron has failed to report the ██████████ it owes in Apple royalties for Q1 2017.

89.    On April 25, 2017, however, Qualcomm received a letter from Apple, in which a senior Apple executive stated that "Apple has not remitted funds to [Defendants] for royalty payments for the quarter ending March 31, 2017".  Apple further stated that it will not make any further royalty payments to Defendants until the litigation between Qualcomm and Apple is resolved—that is, during the

1  pending lawsuits (which could take years to resolve) and any subsequent cases that

2  Apple chooses to file (for which the duration is impossible to determine).

3      90.    In a formal statement released a few days later, Apple stated:

4  "Without an agreed-upon rate to determine how much is owed, we have suspended

5  payments until the correct amount can be determined by the court."  Apple's

6  statement did not mention the License Agreements under which Defendants have

7  been paying royalties for the past decade (or longer).

8      91.    Apple orchestrated the actions of each Defendant.  In addition to

9  withholding payments from Defendants for Qualcomm royalties, Apple instructed

10  Defendants to withhold corresponding royalty payments from Qualcomm.

11  Moreover, Apple has agreed to indemnify Defendants for any damages they may

12  incur as a result of breaching their agreements with Qualcomm, further

13  demonstrating Apple's strong-arm tactics.

14      92.    Defendants subsequently indicated to Qualcomm that they would not

15  pay any Q1 2017 royalties for Apple products.  Collectively, Defendants have

16  withheld nearly ▮▮▮▮▮▮▮ in Q1 2017 royalty payments owed to Qualcomm.

17      93.    *Foxconn*:  On April 26, 2017, Qualcomm received an email from

18  Foxconn stating:  "Still wa[i]ting for funds from customer, I have no idea when

19  [Foxconn] can release pa[y]ment to you."  Foxconn also informed Qualcomm that

20  its current Apple royalty payment was on hold and that Apple had instructed

21  Foxconn's legal team to contact Apple's legal team.

22      94.    On May 12, 2017, Qualcomm received an email from Foxconn

23  confirming that Foxconn plans to pay the full amount of royalties for Q1 2017 that

24  it reported for *non-Apple* products.  Foxconn has paid a portion of its reported Q1

25  2017 royalties for *non-Apple* products and has informed Qualcomm that it will

26  make the remaining payments in the near future.

27

28

95.    *Pegatron*:  On April 17, 2017, Pegatron told Qualcomm by phone that it was awaiting further instruction on the payment of royalties for Apple products. Pegatron never updated Qualcomm on the payment of royalties for Apple products.

96.    Pegatron has paid the full amount of royalties for Q1 2017 that it reported on *non-Apple* products.

97.    *Compal*:  On April 27, 2017, Qualcomm received an email from Compal stating that Apple had "recently formally requested" that Compal "stop the royalty payment to [Q]ualcomm" until the "legal action is completed".  Compal also stated that it "may have to take some action about this to revise the Q1 report".

98.    On May 3, 2017, Compal emailed Qualcomm, stating: "We received the notification from Apple about royalty payment.  Apple will not be transmitting funds to [Compal] for the quarterly royalty payment to Qualcomm [for] 2017Q1. So we will only submit non-Apple's report/payment."

99.    On May 11, 2017, Qualcomm received an email from Compal confirming that Compal planned to pay the full amount of royalties for Q1 2017 that it reported on *non-Apple* products.  On May 15, 2017, Qualcomm received Compal's payment for royalties on *non-Apple* products.

100.   *Wistron*:  Wistron has not submitted any Q1 2017 report for Apple products specifying the royalties it owes to Qualcomm.

101.   However, Wistron has paid the full amount of royalties for Q1 2017 that it reported on *non-Apple* products.

102.   Defendants' Q1 2017 payment deadlines have now passed.  As of the filing of this action, none of the Defendants has paid any of the royalties it owes for Q1 2017 Apple products.

103.   Notably, Defendants either have paid their reported Q1 2017 royalties on non-Apple products in full or have confirmed that those payments will be made in the immediate future.

**V.     Defendants Have Breached Their Agreements with Qualcomm.**

104.   Defendants breached their License Agreements by (i) failing to pay the royalties they owe on Apple products; (ii) failing to cooperate with Qualcomm's royalty audits; and (iii) manipulating or misstating the sales information, on which royalty calculations are based. ███████████████████████████████ ████████████████████████████████.

> **A.     Defendants Breached Their License Agreements by Failing To Pay The Royalties They Owe.**

105.   Defendants' License Agreements are unambiguous and require timely payment of royalties on a quarterly basis.

106.   Defendants' conduct leaves no doubt as to Defendants' payment obligations under their License Agreements and that Defendants are fully aware of those obligations:

- During the past decade (or longer), Defendants have consistently paid royalties to Qualcomm on non-Apple and Apple products under the License Agreements;

- For Q4 2016, by submitting at least partial royalty payments for Apple products, Defendants conceded that they have no excuse for now failing to pay royalties for Apple products;

- For Q4 2016 and Q1 2017, most of the Defendants submitted royalty reports admitting that they owe Qualcomm full royalties on Apple products, some even *certifying* the exact amount owed (but not paid); and

- For Q4 2016 and Q1 2017, Defendants have paid Qualcomm (or have confirmed that they will pay in the immediate future), under the same License Agreements, the full amount of royalties they reported on *non-Apple* products.

107.   Defendants are independent companies, but each has responded to Apple's recent conduct in the exact same way:  they have withheld from Qualcomm whatever amount Apple has withheld from them.  Apple agreed to indemnify Defendants for violating their License Agreements with Qualcomm, further confirming Apple's interference strategy.

108.   ***Apple's interference does not excuse or justify Defendants' non-performance under their contracts with Qualcomm.***

109.   Each Defendant breached its License Agreement by withholding royalties that it owes Qualcomm on Apple products.

110.   Foxconn breached its License Agreement by withholding at least ████████ in Q4 2016 royalties and at least ████████ in Q1 2017 royalties.

111.   Pegatron breached its License Agreement by withholding at least ████████ in Q4 2016 royalties and at least ████████ in Q1 2017 royalties.

112.   Wistron breached its License Agreement by withholding approximately ████████ or more in Q4 2016 royalties and ████████ (that have not even been reported) in Q1 2017 royalties.

113.   Compal breached its License Agreement by withholding at least ████████ in Q1 2017 royalties.

114.   Given Apple's refusal to pay royalties indefinitely, which Defendants have taken as an instruction not to pay royalties for Apple products, Qualcomm will continue indefinitely to be substantially injured by Defendants' ongoing breaches.

**B.     Defendants Have Breached Their Audit Obligations Under Their License Agreements.**

115.   Qualcomm has the right to audit each Defendant to confirm that it is fully paying the royalties it owes Qualcomm under its License Agreement.  The audits are conducted by independent royalty auditors that enter into non-disclosure

1  agreements with Defendants, ensuring that no confidential information belonging to

2  Defendants or any of their customers will be improperly disclosed, including to

3  Qualcomm.  The audit is supposed to cover books and records concerning any

4  products sold by Defendants, including documents showing the number of products

5  sold and the consideration charged by Defendants for such sales.

6       116.   As to Apple products, Defendants have repeatedly failed to provide the

7  necessary information to conduct audits as required by their License Agreements.

8  Due to Defendants' refusal to provide Qualcomm with applicable books and

9  records for Apple products, Qualcomm is unable to exercise its audit rights to

10  determine whether it is receiving all of the royalties that Defendants owe

11  Qualcomm on Apple products.

12       117.   By contrast, Defendants consistently have provided the requested audit

13  information as to non-Apple products.

14       118.   As an example, Foxconn has refused to supply basic information

15  regarding its production and sale of iPhones, including royalty reports, to an

16  independent royalty auditor, stating that this information was "confidential per

17  Apple".  For its non-Apple customers, Foxconn has consistently provided such

18  basic information to the auditors.  In fact, the auditors that perform royalty audits of

19  Defendants generally have open access to Foxconn's books and records as to non-

20  Apple products.

21       119.   Defendants have breached and continue to breach their License

22  Agreements by refusing to provide complete information to royalty auditors

23  regarding their sales of Apple products.

24         **C.**    **Defendants Have Breached Their Reporting Obligations**

25             **Under Their License Agreements.**

26       120.   Defendants also have misstated or manipulated the sales information in

27  their royalty reports, thereby causing Defendants to underpay the royalties owed to

28  Qualcomm under their respective License Agreements.

---

121.   For example, under their License Agreements, Defendants are required to calculate NSP based on the gross selling price and/or value of other consideration "charged" by Defendants to the purchaser.  The License Agreements clearly define how NSP is to be calculated and enumerate only limited, specific types of consideration that may be excluded.

122.   Defendants have failed to include in their stated NSPs certain covered consideration charged to Apple for Apple products. ███████████████ ████████████████████████████████████████████████████ ████████████████████

123.   By failing to provide accurate sales information for the products they sell, and thereby failing to pay the full amount of royalties owed to Qualcomm, Defendants have breached their License Agreements.

**D.     Defendants Breached Their Master Software Agreements.**

124.   By using Qualcomm's copyrighted software in the manufacture and sale of cellular products, ████████████████████████████ ████████████████████████████████████████ ██████████████████

125.   ██████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████.

126.   Defendants have used and continue to use Qualcomm's copyrighted software in the manufacture and sale of cellular products, █████████████ ████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████

1    ████████    In doing so, each Defendant has materially breached its MSA with

2    Qualcomm.

3                                    **COUNT I**

4                    **Foxconn's Breach of Its License Agreement**

5         127.   Qualcomm restates, re-alleges, and incorporates by reference each of

6    the allegations set forth above as if fully set forth herein.

7         128.   The Foxconn License Agreement between Qualcomm and Foxconn is

8    a valid and enforceable agreement between the parties.

9         129.   Qualcomm has performed all of its obligations under the Foxconn

10   License Agreement.

11        130.   Foxconn has breached its License Agreement by (i) failing to pay

12   Qualcomm royalties owed under the License Agreement, (ii) failing to cooperate

13   with Qualcomm's royalty audits, and (iii) manipulating and misstating the sales

14   information for the products it sells.

15        131.   Qualcomm has been injured, and continues to be injured, by

16   Foxconn's material breaches of its License Agreement.   Qualcomm is entitled to

17   injunctive relief and/or specific performance and compensatory and consequential

18   damages in an amount to be proven at trial.

19              **A.      Foxconn Has Refused To Pay the Royalties It Owes.**

20        132.   Section 5.2 of the Foxconn License Agreement requires Foxconn to

21   pay royalties to Qualcomm for each Subscriber Unit that it sells.  Specifically,

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████

25        133.   For Q4 2016, Foxconn failed to pay Qualcomm the full royalties owed

26   under its License Agreement.  The terms of the Foxconn License Agreement

27   required Foxconn to pay Qualcomm approximately ███████, which Foxconn

28

1  admitted, certifying in one of its royalty reports that it "sold ███████ [iPhones],

2  and owes ██████████ in royalties to QUALCOMM for these sales".  Of

3  that amount, Foxconn paid only ███████ with respect to those sales,

4  withholding at least ██████████ in royalties owed to Qualcomm.

5      134.  On April 17, 2017, Foxconn submitted one of its Q1 2017 royalty

6  reports for Apple products, certifying that it "sold ███████ [iPhones], and owes

7  ██████████ in royalties to QUALCOMM for these Sales".  In separate

8  reports, received on April 14, 2017, Foxconn confirmed that it owed an additional

9  ███████ in Q1 2017 iPad royalties.  On April 25 and 26, 2017, Foxconn

10  informed Qualcomm by phone and email that its royalty payments on Apple

11  products for Q1 2017 were on hold and that Apple had instructed Foxconn's legal

12  team to contact Apple's legal team.

13      135.  The deadline for Foxconn's payment of Q1 2017 royalties, ███████

14  ███ has passed, and Foxconn has not paid any royalties for Apple products for Q1

15  2017.  Foxconn has paid a portion of its Q1 2017 royalties reported for non-Apple

16  products and has informed Qualcomm that it plans to pay the remaining reported

17  non-Apple royalties in full.

18      136.  Foxconn breached its long-standing License Agreement by

19  substantially underpaying the royalties owed on Apple products for Q4 2016 and by

20  failing to pay any of the royalties owed on Apple products for Q1 2017.

21          **B.  Foxconn Has Failed To Cooperate with Qualcomm's Audits.**

22      137.  Section 14.1 of the Foxconn License Agreement requires Foxconn to

23  ████████████████████████████████████████████████████

24  ██████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████

27  ██████████████████████████████████████████

28

138.   Under Section 14.2 of the Foxconn License Agreement, Foxconn agreed to permit regular audits of its ██████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ ████████████████████████████

139.   Foxconn has failed to produce to the independent auditors books and records containing basic information evidencing its sales of cellular products to Apple.  Foxconn's conduct has prevented the auditors from determining whether Foxconn has paid the royalties it owes Qualcomm under its License Agreement.  As a result, Qualcomm has been unable to close its audits.

140.   Foxconn breached and continues to breach its License Agreement by failing to comply with its audit obligations as to Apple products.  Every day that Foxconn prevents Qualcomm from closing any audit, it is breaching its audit obligations under its License Agreement.

### C.   Foxconn Has Reported Inaccurate Sales Information in Order To Understate the Royalties Owed to Qualcomm.

141.   Under Section 1 of the Foxconn License Agreement, the Net Selling Price, on which Qualcomm's royalty is based, is the ███████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

142.   Under Section 14.1 of the Foxconn License Agreement, Foxconn

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ Pursuant to the Foxconn License

Agreement, ████████████████████████████████████████████████

████████████████████

143.   Foxconn has misstated or manipulated the sales information for the

cellular products it sells in the reports it has provided to Qualcomm. ███████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ By failing to accurately

report its sales information, and thereby failing to pay the full amount of royalties

owed to Qualcomm, Foxconn has breached its License Agreement.

## COUNT II

### Foxconn's Breach of Its Master Software Agreement

144.   Qualcomm restates, re-alleges, and incorporates by reference each of

the allegations set forth above as if fully set forth herein.

145.   The MSA between Qualcomm and Foxconn, entered into on

January 11, 2010, as amended (the "Foxconn MSA"), is a valid and enforceable

agreement between the parties.

146.   Qualcomm has performed all of its obligations under the Foxconn

MSA.

147.   Foxconn has materially breached its MSA by using Qualcomm's

copyrighted software in the manufacture and sale of cellular products, ███████████

██████████████████████████████████████████

148. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████

149.   Foxconn has been using and continues to use Qualcomm's copyrighted software in the manufacture and sale of cellular products, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This is a material breach of Section 3 of the Foxconn MSA.

150.   Qualcomm has been injured by Foxconn's material breaches of its MSA, and Qualcomm is entitled to compensatory and consequential damages in an amount to be proven at trial.

## COUNT III

### Pegatron's Breach of Its License Agreement

151.   Qualcomm restates, re-alleges, and incorporates by reference each of the allegations set forth above as if fully set forth herein.

152.   The Pegatron License Agreement between Qualcomm and Pegatron is a valid and enforceable agreement between the parties.

153.   Qualcomm has performed all of its obligations under the Pegatron License Agreement.

154.   Pegatron has breached its License Agreement by (i) failing to pay Qualcomm royalties owed under the License Agreement, (ii) failing to cooperate with Qualcomm's royalty audits, and (iii) manipulating and misstating the sales information for the products it sells.

155.   Qualcomm has been injured, and continues to be injured, by Pegatron's material breaches of its License Agreement.  Qualcomm is entitled to

injunctive relief and/or specific performance and compensatory and consequential damages in an amount to be proven at trial.

### A.   Pegatron Has Refused To Pay the Royalties It Owes.

156.   Section 5.2 of the Pegatron License Agreement requires Pegatron to pay royalties to Qualcomm for each Subscriber Unit that it sells.  Specifically,

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

157.   For Q4 2016, Pegatron failed to pay Qualcomm the full royalties owed under its License Agreement.  Although the terms of the Pegatron License Agreement required Pegatron to pay Qualcomm at least ████████████, Pegatron paid only ████████████ (including withholding tax), withholding at least ████████████ in royalties owed to Qualcomm.

158.   On April 15, 2017, Pegatron submitted its Q1 2017 royalty report for Apple products, admitting that it owes Qualcomm ████████████.  On April 17, 2017, Pegatron told Qualcomm by phone that it was awaiting further instruction on the payment of royalties for Apple products.  Pegatron never updated Qualcomm on the payment of royalties for Apple products.

159.   The deadline for Pegatron's payment of Q1 2017 royalties, ████████████ has passed, and Pegatron has not paid any royalties for Apple products for Q1 2017.  Pegatron has paid the full amount of royalties for Q1 2017 that it reported on non-Apple products.

160.   Pegatron breached its long-standing License Agreement by substantially underpaying the royalties owed on Apple products for Q4 2016 and by failing to pay any of the royalties owed on Apple products for Q1 2017.

**B.    Pegatron Has Failed To Cooperate with Qualcomm's Audits.**

161.   Section 14.1 of the Pegatron License Agreement requires Pegatron to

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

162.   Under Section 14.2 of the Pegatron License Agreement, Pegatron

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

163.   Pegatron has failed to produce to the independent auditors books and records containing basic information evidencing its sales of cellular products to Apple.  Pegatron's conduct has prevented the auditors from determining whether Pegatron has paid the royalties it owes Qualcomm under its License Agreement.  As a result, Qualcomm has been unable to close its audits.

164.   Pegatron breached and continues to breach its License Agreement by failing to comply with its audit obligations as to Apple products.  Every day that Pegatron prevents Qualcomm from closing any audit, it is breaching its audit obligations under its License Agreement.

**C.    Pegatron Has Reported Inaccurate Sales Information in Order To Understate the Royalties Owed to Qualcomm.**

165.   Under Section 1 of the Pegatron License Agreement, the Net Selling Price, on which Qualcomm's royalty is based, is the ███████████

166.   Under Section 14.1 of the Pegatron License Agreement, Pegatron ████████████████████████████ Pursuant to the Pegatron License Agreement, ████████████████████

167.   Pegatron has misstated and manipulated the NSP of the cellular products it sells in the reports it has provided to Qualcomm. ████████████████████ By failing to accurately report its sales information, and thereby failing to pay the full amount of royalties owed to Qualcomm, Pegatron has breached its License Agreement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT IV**

**Pegatron's Breach of Its Master Software Agreement**

168.    Qualcomm restates, re-alleges, and incorporates by reference each of the allegations set forth above as if fully set forth herein.

169.    The MSA between Qualcomm and Pegatron, entered into on July 13, 2010, as amended (the "Pegatron MSA"), is a valid and enforceable agreement between the parties.

170.    Qualcomm has performed all of its obligations under the Pegatron MSA.

171.    Pegatron has materially breached its MSA by using Qualcomm's copyrighted software in the manufacture and sale of cellular products, ███████ ████████████████████████████████████████

172.    ██████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ ███████████████████

173.    Pegatron has been using and continues to use Qualcomm's copyrighted software in the manufacture and sale of cellular products, ████████ █████████████████████████████████████ ███████████████████████████████ ██████████████████████████████████ This is a material breach of Section 3 of the Pegatron MSA.

174.    Qualcomm has been injured by Pegatron's material breaches of its MSA, and Qualcomm is entitled to compensatory and consequential damages in an amount to be proven at trial.

## COUNT V

### Wistron's Breach of Its License Agreement

175.   Qualcomm restates, re-alleges, and incorporates by reference each of the allegations set forth above as if fully set forth herein.

176.   The Wistron License Agreement between Qualcomm and Wistron is a valid and enforceable agreement between the parties.

177.   Qualcomm has performed all of its obligations under the Wistron License Agreement.

178.   Wistron has breached its License Agreement by (i) failing to pay Qualcomm royalties owed under the License Agreement, (ii) failing to cooperate with Qualcomm's royalty audits, and (iii) manipulating and misstating the sales information for the products it sells.

179.   Qualcomm has been injured, and continues to be injured, by Wistron's material breaches of its License Agreement.  Qualcomm is entitled to injunctive relief and/or specific performance and compensatory and consequential damages in an amount to be proven at trial.

### A.    Wistron Has Refused To Pay the Royalties It Owes.

180.   Section 5.2 of the Wistron License Agreement requires Wistron to pay royalties to Qualcomm for each Subscriber Unit that it sells.  Specifically,

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

181.   For Q4 2016, Wistron failed to pay Qualcomm the full royalties owed under its License Agreement.  Although the terms of the Wistron License Agreement required Wistron to pay Qualcomm ████████████████ (based on the sales reported by Apple, which Qualcomm is unable to verify), Wistron paid

only approximately ████████, withholding at least ████████ in royalties owed to Qualcomm.

182.   Wistron has not even submitted its Q1 2017 report for Apple products. The deadline for Wistron's payment of Q1 2017 royalties, ████████████ has passed, and Wistron has not paid any royalties for Apple products for Q1 2017. Wistron has paid the full amount of royalties for Q1 2017 that it reported on non-Apple products.

183.   Wistron breached its long-standing License Agreement by substantially underpaying the royalties owed on Apple products for Q4 2016 and by failing to pay any of the royalties owed on Apple products for Q1 2017.

**B.   Wistron Has Failed To Cooperate with Qualcomm's Audits.**

184.   Section 14.1 of the Wistron License Agreement requires Wistron to ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████

185.   Under Section 14.2 of the Wistron License Agreement, Wistron ██████ ████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████

186.   Wistron has failed to produce to the independent auditors books and records containing basic information evidencing its sales of cellular products to

Apple. Wistron's conduct has prevented the auditors from determining whether Wistron has paid the royalties it owes Qualcomm under its License Agreement, and as a result, Qualcomm has been unable to close its audit.

187.   Wistron breached and continues to breach its License Agreement by failing to comply with its audit obligations as to Apple products. Every day that Wistron prevents Qualcomm from closing any audit, it is breaching its audit obligations under its License Agreement.

### C.   Wistron Has Reported Inaccurate Sales Information in Order To Understate the Royalties Owed to Qualcomm.

188.   Under Section 1 of the Wistron License Agreement, the Net Selling Price, on which Qualcomm's royalty is based, is the

189.   Under Section 14.1 of the Wistron License Agreement, Wistron

Pursuant to the Wistron License Agreement,

190.   Wistron has misstated and manipulated the sales information for the cellular products it sells in the reports it has provided to Qualcomm.

---

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ By failing to accurately

report its sales information, and thereby failing to pay the full amount of royalties

owed to Qualcomm, Wistron has breached its License Agreement.

## COUNT VI

### Wistron's Breach of Its Master Software Agreement

191.   Qualcomm restates, re-alleges, and incorporates by reference each of

the allegations set forth above as if fully set forth herein.

192.   The MSA between Qualcomm and Wistron, entered into on April 7,

2010, as amended (the "Wistron MSA"), is a valid and enforceable agreement

between the parties.

193.   Qualcomm has performed all of its obligations under the Wistron

MSA.

194.   Wistron has materially breached its MSA by using Qualcomm's

copyrighted software in the manufacture and sale of cellular products, ██████████

███████████████████████████████████

195.   ███████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

███████████████████.

196.   Wistron has been using and continues to use Qualcomm's copyrighted

software in the manufacture and sale of cellular products, ████████████████████

████████████████████████████████████

██████████████████████████████

███████████████████████████████████ This

is a material breach of Section 3 of the Wistron MSA.

197.   Qualcomm has been injured by Wistron's material breaches of its MSA, and Qualcomm is entitled to compensatory and consequential damages in an amount to be proven at trial.

## COUNT VII

### Compal's Breach of Its License Agreement

198.   Qualcomm restates, re-alleges, and incorporates by reference each of the allegations set forth above as if fully set forth herein.

199.   The Compal License Agreement between Qualcomm and Compal is a valid and enforceable agreement between the parties.

200.   Qualcomm has performed all of its obligations under the Compal License Agreement.

201.   Compal has breached its License Agreement by (i) failing to pay Qualcomm royalties owed under the License Agreement, (ii) failing to cooperate with Qualcomm's royalty audits, and (iii) manipulating and misstating the sales information for the products it sells.

202.   Qualcomm has been injured, and continues to be injured, by Compal's material breaches of its License Agreement.  Qualcomm is entitled to injunctive relief and/or specific performance and compensatory and consequential damages in an amount to be proven at trial.

### A.    Compal Has Refused To Pay the Royalties It Owes.

203.   Section 5.2 of the Compal License Agreement requires Compal to pay royalties to Qualcomm for each Subscriber Unit that it sells.  Specifically,

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

204.   On April 19, 2017, Compal submitted its Q1 2017 royalty report for Apple products, admitting that it owes Qualcomm ████████ .

205.   On April 27, 2017, Qualcomm received an email from Compal stating that Apple (a "shared key client" in a "major legal action" with Qualcomm) "has recently formally requested [C]ompal to stop the royalty payment to [Q]ualcomm that [sic] associated to their business until legal action is completed.  We may have to take some action about this to revise the Q1 report".

206.   On May 3, 2017, Compal emailed Qualcomm, stating: "We received the notification from Apple about royalty payment.  Apple will not be transmitting funds to [Compal] for the quarterly royalty payment to Qualcomm [for] 2017Q1. So we will only submit non-Apple's report/payment."

207.   The deadline for Compal's payment of Q1 2017 royalties, ████████ ████, has passed, and Compal has not paid any royalties for Apple products for Q1 2017.  Compal has paid the full amount of royalties for Q1 2017 that it reported on non-Apple products.

208.   Compal breached its long-standing License Agreement by failing to pay any of the royalties owed on Apple products for Q1 2017.

**B.     Compal Has Failed To Cooperate with Qualcomm's Audits.**

209.   Section 14.1 of the Compal License Agreement requires Compal to ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

210.   Under Section 14.2 of the Compal License Agreement, Compal ████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████

211.   Compal has failed to produce to the independent auditors books and records containing basic information evidencing its sales of cellular products to Apple.  Compal's conduct has prevented the auditors from determining whether Compal has paid the royalties it owes Qualcomm under its License Agreement, and as a result, Qualcomm has been unable to close its audits.

212.   Compal breached and continues to breach its License Agreement by failing to comply with its audit obligations as to Apple products.  Every day that Compal prevents Qualcomm from closing any audit, it is breaching its audit obligations under its License Agreement.

**C.   Compal Has Reported Inaccurate Sales Information in Order To Understate the Royalties Owed to Qualcomm.**

213.   Under Section 1 of the Compal License Agreement, the Net Selling Price, on which Qualcomm's royalty is based, is the

214.   Under Section 14.1 of the Compal License Agreement, Compal

Pursuant to the Compal License Agreement,

215.   Compal has misstated and manipulated the sales information for the cellular products it sells in the reports it has provided to Qualcomm. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ By failing to accurately report its sales information, and thereby failing to pay the full amount of royalties owed to Qualcomm, Compal has breached its License Agreement.

**COUNT VIII**

**Compal's Breach of Its Master Software Agreement**

216.   Qualcomm restates, re-alleges, and incorporates by reference each of the allegations set forth above as if fully set forth herein.

217.   The MSA between Qualcomm and Compal, entered into on January 13, 2010, as amended (the "Compal MSA"), is a valid and enforceable agreement between the parties.

218.   Qualcomm has performed all of its obligations under the Compal MSA.

219.   Compal has materially breached its MSA by using Qualcomm's copyrighted software in the manufacture and sale of cellular products, ██████

████████████████████████████████████████

220.   ████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████

221.   Compal has been using and continues to use Qualcomm's copyrighted software in the manufacture and sale of cellular products, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

1   ██████████████████████████████ This is a material breach

2   of Section 3 of the Compal MSA.

3       222.   Qualcomm has been injured by Compal's material breaches of its

4   MSA, and Qualcomm is entitled to compensatory and consequential damages in an

5   amount to be proven at trial.

6   **COUNT IX**

7   **Declaratory Relief**

8       223.   Qualcomm restates, re-alleges, and incorporates by reference each of

9   the allegations set forth above as if fully set forth herein.

10      224.   Declaratory relief is appropriate because the parties' rights and

11  obligations under the License Agreements and under the Master Software

12  Agreements are at issue.

13      225.   An actual and substantial controversy of immediacy and reality has

14  arisen and now exists between Qualcomm and each Defendant, which have adverse

15  legal interests, concerning their respective rights and obligations under the

16  respective License Agreements because (i) Defendants have refused to pay

17  Qualcomm royalties due under the License Agreements and have made clear their

18  intention to continue to withhold payments as royalties come due in violation of the

19  License Agreements, (ii) Defendants have blocked Qualcomm's audit attempts in

20  violation of the License Agreements, and (iii) Defendants have manipulated and

21  misstated sales information for their manufactured products in violation of the

22  License Agreements.

23      226.   Qualcomm desires a judicial determination as to the parties' rights and

24  obligations under the License Agreements, and a declaration of the following:

25      • Each Defendant has unjustifiably breached its obligations under

26          its License Agreement; and

27      • Qualcomm has not breached its obligations under the License

28          Agreements.

227.   An actual and substantial controversy of immediacy and reality has also arisen and now exists between Qualcomm and each of the Defendants, which have adverse legal interests, concerning their respective rights and obligations under their respective MSAs because each Defendant has materially breached and continues to breach Section 3 of its MSA by using Qualcomm's copyrighted software in the manufacture and sale of cellular products ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

228.   Qualcomm desires a judicial determination as to the parties' rights and obligations under the MSAs, and a declaration of the following:

- Each Defendant has unjustifiably materially breached its obligations under its MSA; and
- Qualcomm has not breached its obligations under the MSAs.

229.   A judicial determination is appropriate at this time pursuant to 28 U.S.C. § 2201 and/or Cal. Code Civ. Proc. § 1060.  A judicial determination is necessary in order for Qualcomm to ascertain its rights and obligations under the License Agreements and MSAs.  Qualcomm's relationship with each Defendant is ongoing, and a judicial determination would inform the parties' future conduct.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Qualcomm demands a jury trial on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Qualcomm respectfully requests that the Court enter judgment as follows:

(a)   Enjoin Defendants from violating the terms and conditions of their License Agreements and/or require Defendants specifically to perform the obligations of their License Agreements, including (i) timely making full and complete payments of royalties for any and all sales of Subscriber Units, (ii) providing Qualcomm's auditors all necessary information and assistance to

complete their regular audits of Defendants, and (iii) providing royalty reports that accurately state their Subscriber Unit sales information, with such information calculated and reported as required by their License Agreements;

     (b)    Declare that, with respect to the License Agreements entered into between Qualcomm and each Defendant:  (i) each Defendant has unjustifiably breached its obligations under its License Agreement, and (ii) Qualcomm has not breached its obligations under the License Agreements;

     (c)    Award compensatory and consequential damages and attorneys' fees pursuant to Section 26 of the Foxconn License Agreement for Foxconn's breach of its License Agreement in an amount to be proven at trial;

     (d)    Award compensatory and consequential damages and attorneys' fees pursuant to Section 26 of the Pegatron License Agreement for Pegatron's breach of its License Agreement in an amount to be proven at trial;

     (e)    Award compensatory and consequential damages and attorneys' fees pursuant to Section 26 of the Wistron License Agreement for Wistron's breach of its License Agreement in an amount to be proven at trial;

     (f)    Award compensatory and consequential damages and attorneys' fees pursuant to Section 26 of the Compal License Agreement for Compal's breach of its License Agreement in an amount to be proven at trial;

     (g)    Declare that, with respect to the Master Software Agreements entered into between Qualcomm and each Defendant:  (i) each Defendant has unjustifiably materially breached its obligations under its MSA, and (ii) Qualcomm has not breached its obligations under the MSAs;

     (h)    Award compensatory and consequential damages and attorneys' fees pursuant to Section 13 of the Foxconn MSA for Foxconn's breach of its MSA in an amount to be proven at trial;

     (i)    Award compensatory and consequential damages and attorneys' fees pursuant to Section 13 of the Pegatron MSA for Pegatron's breach of its MSA in an

1    amount to be proven at trial;

2        (j)    Award compensatory and consequential damages and attorneys' fees

3    pursuant to Section 13 of the Wistron MSA for Wistron's breach of its MSA in an

4    amount to be proven at trial;

5        (k)    Award compensatory and consequential damages and attorneys' fees

6    pursuant to Section 13 of the Compal MSA for Compal's breach of its MSA in an

7    amount to be proven at trial;

8        (l)    Award reasonable attorneys' fees to Qualcomm;

9        (m)    Award expenses, costs, and disbursements in this action, including

10    prejudgment interest; and

11        (n)    Award such other and further relief as the Court deems just and proper.

1

2   Dated:  May 17, 2017                    Respectfully submitted,

3                                           By:   /s/ Karen P. Hewitt

4
                                            **JONES DAY**
5                                           Karen P. Hewitt (SBN 145309)
                                            kphewitt@jonesday.com
6                                           Randall E. Kay (SBN 149369)
                                            rekay@jonesday.com
7                                           4655 Executive Drive, Suite 1500
                                            San Diego, California 92121
8                                           Telephone:  (858) 314-1200
                                            Facsimile:  (858) 345-3178
9
                                            **CRAVATH, SWAINE & MOORE LLP**
10                                          Evan R. Chesler (*pro hac vice*
                                            forthcoming)
11                                          (N.Y. Bar No. 1475722)
                                            echesler@cravath.com
12                                          Keith R. Hummel (*pro hac vice*
                                            forthcoming)
13                                          (N.Y. Bar No. 2430668)
                                            khummel@cravath.com
14                                          Richard J. Stark (*pro hac vice* forthcoming)
                                            (N.Y. Bar No. 2472603)
15                                          rstark@cravath.com
                                            Antony L. Ryan (*pro hac vice*
16                                          forthcoming)
                                            (N.Y. Bar No. 2784817)
17                                          aryan@cravath.com
                                            Gary A. Bornstein (*pro hac vice*
18                                          forthcoming)
                                            (N.Y. Bar No. 2916815)
19                                          gbornstein@cravath.com
                                            J. Wesley Earnhardt (*pro hac vice*
20                                          forthcoming)
                                            (N.Y. Bar No. 4331609)
21                                          wearnhardt@cravath.com
                                            Yonatan Even (*pro hac vice* forthcoming)
22                                          (N.Y. Bar No. 4339651)
                                            yeven@cravath.com
23                                          Vanessa A. Lavely (*pro hac vice*
                                            forthcoming)
24                                          (N.Y. Bar No. 4867412)
                                            vlavely@cravath.com
25                                          Worldwide Plaza, 825 Eighth Avenue
                                            New York, NY 10019
26                                          Telephone:  (212) 474-1000
                                            Facsimile:  (212) 474-3700
27

28

---

QUALCOMM'S COMPLAINT                        -51-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
David A. Nelson (*pro hac vice* forthcoming)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
Stephen Swedlow (*pro hac vice* forthcoming)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

Alexander Rudis (*pro hac vice* forthcoming)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
50 California St., 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Plaintiff*
**QUALCOMM INCORPORATED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28