UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED,<br><br>      Plaintiff,<br><br>   v.<br><br>COMPAL ELECTRONICS, INC., FIH MOBILE LTD., HON HAI PRECISION INDUSTRY CO., LTD., PEGATRON CORPORATION, and WISTRON CORPORATION,<br><br>      Defendants. | Case No. 3:17-cv-01010-GPC-MDD<br><br><br>**ORDER DENYING PRELIMINARY INJUNCTION**<br><br>_____<br><br>(Redacted version)<br><br>ECF No. 35-1 |
| COMPAL ELECTRONICS, INC., FIH MOBILE LTD., HON HAI PRECISION INDUSTRY CO., LTD., PEGATRON CORPORATION, and WISTRON CORPORATION,<br><br>      Counterclaimants,<br><br>   v.<br><br>QUALCOMM INCORPORATED,<br><br>      Counter Defendant. | |
| COMPAL ELECTRONICS, INC., FIH MOBILE LTD., HON HAI PRECISION INDUSTRY CO., LTD., PEGATRON CORPORATION, and WISTRON CORPORATION,<br><br>      Third-Party Plaintiffs,<br><br>   v.<br><br>APPLE INC.<br><br>      Third-Party Defendant. | |

Before the Court is a motion for preliminary injunction filed by Plaintiff Qualcomm Incorporated ("Qualcomm") against Defendants Compal Electronics, Inc. ("Compal"), FIH Mobile Ltd. and Hon Hai Precision Industry Co. (together "Foxconn"), Pegatron Corporation ("Pegatron"), and Wistron Corporation ("Wistron"), collectively "Defendants" or "Contract Manufacturers." Dkt. No. 35-1. The motion has been fully briefed. Defendants filed an opposition on July 18, 2017, as did Third-Party Defendant, Apple Inc. ("Apple"). Dkt. Nos. 72, 80. Qualcomm filed a reply on August 1, 2017. Dkt. No. 100. Based upon a review of the moving papers, the applicable law, and for the foregoing reasons, the Court hereby **DENIES** Qualcomm's motion.

## I. INTRODUCTION

This case arises from a dispute over royalty payments owed under license agreements that Defendants attack as illegal and anticompetitive.

Each Defendant is a customer of Qualcomm. They buy Qualcomm's baseband processor chips, which provide connectivity to cellular networks, in order to manufacture cellular devices. Each Defendant is also a licensee of Qualcomm. In exchange for using Qualcomm's intellectual property to manufacture and sell cellular devices, each Defendant has entered into a license agreement that entitles Qualcomm to a percentage of the net selling price of all devices sold by Defendants.

Apple is the largest customer of each Defendant. Apple designs cellular devices and outsources the manufacturing of those devices to Defendants. Apple, however, is not a licensee of Qualcomm, meaning, Apple does not directly pay Qualcomm for permission to use its intellectual property. Instead, Apple pays royalties to Qualcomm through Defendants. For each iPhone or iPad produced by Defendants for Apple, Apple pays for the cost of the device, which includes Qualcomm's baseband processor chips, and for the royalties owed to Qualcomm under Defendants' licensing agreements.

The value of these royalty payments, flowing to Qualcomm from Apple through Defendants, adds up to billions of dollars annually. The royalty cash flow, however, does not stop with Qualcomm. As part of a separate agreement entered into between Apple

and Qualcomm, Qualcomm remits back to Apple, on a quarterly basis, a portion of the royalties paid on Apple's devices.  Put differently, Qualcomm provides Apple with royalty rebates.

Beginning in September 2016, Qualcomm began withholding royalty rebates. Soon thereafter, Apple began to withhold royalty payments.  Then, in January 2017, Apple filed suit against Qualcomm alleging that Qualcomm's licensing practices and royalty provisions violate anti-trust laws, U.S. patent law, public policy, and Qualcomm's commitment to license its intellectual property on fair, reasonable, and nondiscriminatory ("FRAND") terms.  Subsequently, in April 2017, Apple informed Defendants and Qualcomm that it will cease making royalty payments until its lawsuit challenging Qualcomm's licensing and royalty arrangement has been resolved.

This lawsuit followed in May 2017.  In it, Qualcomm alleges that each of the Defendants has breached its licensing and master software agreements with Qualcomm by failing to make the royalty payments owing under each Defendants' respective contract.  Consequently, Qualcomm asks this Court to (1) find that Defendants have committed material breaches; (2) award Qualcomm compensatory and consequential damages, as well as attorneys' fees; and, most importantly for present purposes, (3) enjoin Defendants from violating the terms and conditions of their licensing agreements.

The Contract Manufacturers countersued Qualcomm in July 2017.  In their prayer for relief, they ask the Court, in pertinent part, to decree that (1) Qualcomm has engaged in an illegal contract in restraint of trade in violation of Section 1 of the Sherman Act; (2) Qualcomm is liable for breach of its contractual obligation to offer its standard-essential patents at a FRAND rate; (3) Qualcomm breached its license agreements with the Contract Manufacturers; and (4) Qualcomm's license agreements are unenforceable under California law.  The Contract Manufacturers also request, among other relief, that the Court award restitution to them for excessive license fees that they have paid to Qualcomm and enjoin Qualcomm from further unlawful actions.

The Court is mindful of the stakes presented by this suit.  The parties dispute billions of dollars in royalty payments.  In fact, ███████████████████████ ███████████████████████████████████ These are weighty sums; and the Court does not doubt the significance of these payments to Qualcomm's enterprise.

The scales of equity, however, do not bend for dollar amounts alone no matter how great.  In requesting a preliminary injunction, it is Qualcomm's burden to demonstrate that it will endure "irreparable harm" if the Court does not flex its discretionary powers and enjoin any further breaches by Defendants pending this Court's decision on the merits.  And while Qualcomm offers a number of general arguments why it will be irreparably harmed by Defendants' breaches, the Court does not find any of Qualcomm's arguments persuasive as to why it will be irreparably harmed by Defendants' alleged breaches while this case unfolds and before it proceeds to trial.

Qualcomm will have its opportunity to argue that Defendants must either make their royalty payments or stop making Apple devices, but it has offered no legally sufficient reason why this request must be granted before the Court can hear evidence and issue a decision on the merits.  Accordingly, and because the Court finds that Qualcomm has not demonstrated a likelihood that it will be irreparably harmed in the absence of a preliminary injunction, the Court denies Qualcomm the relief it seeks.

## II.  BACKGROUND

Qualcomm is a world-leading innovator in cellular technologies and other advanced mobile technologies.  Dkt. No. 35-1 at 6.  It has created and brought to market cellular technologies, such as the 2G, 3G, and 4G systems, that allow our smartphones to work.  *Id.*  Currently, Qualcomm owns a portfolio of 130,000 patents, thousands of which are essential to various cellular standards (cellular standard-essential patents or "SEPs").  *Id.* at 11.  Qualcomm also owns patents that are essential to other industry standards ("non-cellular SEPs"), as well as patents that are not essential to any industry standard ("NEPs").  *Id.*  Stated in practical terms, Qualcomm's patent technology is fundamental

to every modern cellphone.  *Id.* at 10.  In fact, not only do all modern cellphones rely on Qualcomm's patented technology, but many also incorporate cellular baseband chips and associated software that are designed by Qualcomm through Qualcomm Technologies, Inc. ("QTI").  *Id.* at 11.

Compal, Foxconn, Pegatron, and Wistron make and sell wireless products (*e.g.*, phones and tablets) that comply with 3G and 4G LTE cellular standards.  *Id.* at 7.  "As a result," Qualcomm explains, "each Defendant makes and sells devices that necessarily practice Qualcomm cellular SEPs" and that also happen to incorporate Qualcomm's NEPs.  *Id.*  Each Defendant pays for the right to use Qualcomm's intellectual property pursuant to a patent license agreement referred to as a Subscriber Unit License Agreement ("SULA").  Dkt. No. 35-1 at 7; Dkt. No. 72 at 14.  Defendants also pay Qualcomm for its baseband processor chips, which Defendants use to assemble cellular devices.  Dkt. No. 72 at 13.  Defendants, therefore, are both direct licensees of Qualcomm's intellectual property and customers of Qualcomm's baseband chips.  *See id.*

Each of the Defendants has a chip supply agreement and a licensing agreement with Qualcomm.  *Id.* at 11.  The license agreements, which are the subject of the current dispute, require Defendants to pay royalties to Qualcomm for every device sold by Defendants.  Dkt. No. 35-1 at 7.  Specifically, the license agreements state that all Defendants, with the exception of Compal, ███████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Dkt. No. 133-1 at 11 (under seal).  To facilitate these payments, Defendants send Qualcomm royalty reports that specify the amount owed for the quarter and then pay the corresponding amount.  *See* Dkt. No. 35-1 at 7.  To date, Defendants have paid royalties under these license

───────────────────

[1] ████████████████████████████████

agreements for between three and fifteen years.  *Id.* at 11 (Compal has paid for fifteen years, Foxconn for eleven, Pegatron for seven, and Wistron for three).

The overwhelming majority of devices manufactured by Defendants are sold to other companies that rebrand the devices and sell them directly to consumers.  *Id.* at 7. Defendants manufacture devices for ███████████, but their largest cellular customer is Apple.  Dkt. No. 133-1 at 12 (under seal).  Apple contracts Defendants to create and assemble devices, like iPhones and iPads, that Apple designs.  *See* Dkt. No. 72 at 11. Apple does not manufacturer its own devices.  Dkt. No. 35-1 at 7.  As such, Defendants are responsible for manufacturing virtually every iPhone and iPad sold worldwide.  *Id.*

The devices that Defendants create for Apple incorporate Qualcomm's patented technology and baseband processor chips.  *See* Dkt. No. 72 at 13-14.  Apple, however, does not have a patent license from Qualcomm.  Dkt. No. 35-1 at 7.  Instead, Apple relies on Defendants' licenses with Qualcomm to provide it with the permission it needs to create products incorporating Qualcomm's technology.  *Id.* at 7-8.  Apple, in turn, pays Defendants for the royalties that Defendants owe to Qualcomm under Defendants' respective license agreements.  *Id.*  Notwithstanding the fact that Apple pays Defendants' contractual royalty obligations, Defendants' license agreements are kept confidential from Apple.  Dkt. No. 80 at 10.

Although Apple and Qualcomm do not have a license agreement, Apple and Qualcomm have other bilateral business agreements.  One of these agreements, the Strategic Terms Agreement ("STA") came about once Apple began procuring Qualcomm chips and licensing-associated software for use in its fourth-generation iPhone.  *See* Dkt. No. 35-1 at 12.  Because Qualcomm "faced fierce competition for those (and later) sales," *id.*, Qualcomm ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████ Dkt. No. 133-1 at 12 (under seal).  ██████████████████████████████████████

3:17-cv-01010-GPC-MDD

1                                                      *Id.* at 12-13, n.2 (under

2 seal).

3         Another agreement entered into between Qualcomm and Apple is the Business

4 Cooperation and Patent Agreement ("BCPA"). Dkt. No. 80 at 10. The BCPA contains a

5 provision that requires Qualcomm to make payments to Apple that effectively constitute

6 royalty rebates. *Id.* Qualcomm and Apple entered into the BCPA on January 1, 2013 and

7 it expired on December 31, 2016. *Id.* at 10-11. The BCPA, which has been submitted

8 under seal, also contains a provision that essentially provides that Apple may not litigate

9 or induce litigation concerning whether Qualcomm's licensing model violates its FRAND

10 obligations or whether Qualcomm charges its licensees for exhausted patents. *Id.* at 12-

11 13. Apple states that it conceded to this provision "because it had no suitable alternative

12 suppliers for chipsets at the time." *Id.* at 12. Apple emphasizes, however, that the

13 provision does not prevent Apple from responding freely to a request or inquiry from

14 governmental authorities. *Id.* at 13.

15         A dispute between Apple and Qualcomm arising out of the BCPA precipitated the

16 current lawsuit between Qualcomm and the Contract Manufacturers. On September 16,

17 2016, Qualcomm withheld the rebate payment, amounting to $963 million, that it owed to

18 Apple for the second calendar quarter of 2016. Dkt. No. 80 at 14, 16. When Apple

19 inquired into why Qualcomm had failed to make the required payment, Qualcomm stated

20 that its actions were due to "legal issues" associated with a hearing held before the Korea

21 Fair Trade Commission. *Id.* at 14.

22         In 2015, the Korea Free Trade Commission ("KFTC") had opened an investigation

23 into Qualcomm's chipset licensing practices. Dkt. No. 72 at 17-18. Apple, in turn and at

24 the request of the KFTC, participated in the investigation by giving a presentation to the

25 KFTC, on August 17, 2016, concerning Qualcomm's alleged monopoly power,

26 exclusionary conduct, the competitive effects of that conduct, and the proper remedy.

27 Dkt. No. 80 at 14. Once news of Apple's participation in the hearing reached Qualcomm,

28

3:17-cv-01010-GPC-MDD

Qualcomm withheld the $963 million in royalties that it owed Apple under the BCPA. *See id.*

Qualcomm refused to make its royalty rebate payments to Apple again on October 9, 2016, citing Apple's interactions with regulators. *Id.* According to Qualcomm, that Apple had spoken with regulators violated "the terms and spirit of the BCPA" because it had "affirmatively advocated for governmental authorities to disturb Qualcomm's business." *Id.* at 15 (quoting Exhibit 6 at 1).

This dispute under the BCPA then led to another. During the fourth quarter of 2016, Apple deducted $963 million — that is, the exact amount Apple believed Qualcomm owed it under the BCPA — from the total royalty payments that Apple indirectly owed to Qualcomm through the Contract Manufacturers. *See* Dkt. No. 35-1 at 8. Consequently, the Contract Manufacturers did not pay Qualcomm. *Id.* By the end of the fourth quarter of 2016, Foxconn owed Qualcomm ███████ in royalties, Pegatron owed more than ██████████, Wistron more than ██████████, and Compal owed ██████ Dkt. No. 133-1 at 18 (under seal); Samimi Decl. ¶ 22, Dkt. No. 133-7 at 6 (under seal).

Although the Contract Manufacturers' non-payment "appeared to be a one-time event" arising from Apple and Qualcomm's dispute under the BCPA, that turned out not to be the case. Dkt. No. 35-1 at 8. On January 20, 2017, Apple filed a lawsuit against Qualcomm, *Apple Inc. v. Qualcomm Inc.*, 3:17-cv-00108-GPC-MDD (S.D. Cal. 2017) challenging, among other issues, the enforceability of Qualcomm's royalty provisions with Defendants. Contemporaneously, Apple notified Qualcomm that it would not remit any royalties to Qualcomm for the first quarter of 2017 and would not make future royalty payments "until the litigation between Apple and Qualcomm is resolved." *Id.* at 14. Around that same time, Apple also instructed Defendants not to pay Qualcomm any royalties for Apple products and agreed to indemnify Defendants for any breach that Defendants might face under their license agreements with Qualcomm. *Id.* at 14-15.

1    As a result, by the end of the first quarter of 2017, Defendants additionally owed

2    Qualcomm approximately ███████████ in royalties.  Dkt. No. 133-1 at 15 (under seal).

3    **III. LEGAL STANDARD**

4     "A preliminary injunction is an extraordinary remedy never awarded as of right."

5    *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24 (2008).  "In each case, courts

6    must balance the competing claims of injury and must consider the effect on each party

7    of the granting or withholding of the requested relief."  *Id.* (citing *Amoco Prod. Co. v.*

8    *Gambell*, 480 U.S. 531, 542 (1987) (internal citations omitted)).  As such, the "grant of a

9    preliminary injunction is a matter committed to the discretion of the trial judge[.]"  *Evans*

10   *v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013).

11   This discretion allows courts to properly evaluate when it is appropriate to grant

12   preliminary relief in light of the "infinite variety of situations which may confront it."

13   *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3d Cir. 1971).

14        District courts exercise this discretion according to a four-factor test mandated by

15   traditional principles of equity.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

16   (2006).  The test requires a plaintiff to demonstrate (1) a likelihood of success on the

17   merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that

18   the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the

19   public interest.  *Winter*, 555 U.S. at 20.

20   **IV. DISCUSSION**

21        Qualcomm has moved for a preliminary injunction enjoining Defendants, that is,

22   Apple's Contract Manufacturers, from violating the terms and conditions of their license

23   agreements during the pendency of this litigation.  Qualcomm argues that the Defendants

24   have clearly breached their license agreements by withholding royalty payments from

25   Qualcomm.  Dkt. No. 35-1 at 20.  As such, Qualcomm contends that Defendants should

26   either continue making royalties payments in accordance with their obligations under the

27   license agreements or stop selling Apple products.  *Id.*

28

In response, the Contract Manufacturers and Apple argue that Qualcomm's motion seeks to "short circuit" an adjudication on the merits.  Dkt. No. 72 at 11.  They argue that Qualcomm's preliminary injunction is an improper attempt to enforce immediate compliance with the license agreements, and immediate payment of disputed royalty fees, without first resolving the legal challenges raised in Defendants' countersuit, here, and Apple's stand-alone suit against Qualcomm in related Case No. 3:17-cv-00108.  *Id.* Accordingly, they argue, preliminary injunctive relief should be denied.

### A. Preliminary injunctions in the Ninth Circuit

While there is no doubt that *Winter*'s four-factor test governs this dispute, the parties disagree as to whether some lesser or higher standard of the *Winter* test applies. Qualcomm argues that the Court must apply the Ninth Circuit's sliding scale standard and in so doing conclude that Qualcomm "need show only ***some*** likelihood of irreparable harm[.]"  Dkt. No. 35-1 at 21 (emphasis in original).  Apple and the Contract Manufacturers, in reply, aver that this Court should apply the "doubly demanding" mandatory injunction standard disfavored by the Ninth Circuit.  Dkt. No. 72 at 20-21. The Court will address each of these contentions in turn.

### 1.  Sliding scale standard

Qualcomm repeats throughout its briefing that it only needs to show "some likelihood of irreparable harm" in order to demonstrate that it is entitled to a preliminary injunction because "it is highly likely to succeed on the merits."  Dkt. No. 35-1 at 21; Dkt. No. 100 at 17 ("Because Qualcomm is highly likely to succeed on the merits, a lesser showing of irreparable harm is needed.").  Qualcomm bases this assertion on its interpretation of the Ninth Circuit's sliding scale approach, which, according to Qualcomm, allows a weaker showing on one prong of the *Winter* test to be offset by a stronger showing on another.  Dkt. No. 35-1 at 16.  The Court, however, finds that this view is misplaced as Qualcomm's citations to dicta and footnotes misstate the law.

As the parties are well aware, the Supreme Court's decision in *Winter* altered the preliminary injunction standard in the Ninth Circuit.  Previously, the Ninth Circuit had

held that the possibility of irreparable harm was sufficient, in certain circumstances, to justify a preliminary injunction if and when there was a strong showing of a likelihood of success on the merits. *Winter*, 55 U.S. at 21 ("the Ninth Circuit [  ] held that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm"); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). After *Winter*, however, the mere "possibility" of irreparable harm was no longer sufficient to warrant a preliminary injunction. *Cottrell*, 632 F.3d at 1131 ("Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction.") (emphasis in original).

   *Winter*'s holding, therefore, called into question the "continuing validity of the 'sliding scale' approach to preliminary injunctions" long employed by the Ninth Circuit. *Id.*  Under that approach, the *Cottrell* court explained, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.*  The *Cottrell* court further emphasized that one such iteration of that "sliding scale" approach, known as the "serious questions test," specifically allows for a "stronger showing of irreparable harm" to "offset a lesser showing of likelihood of success on the merits." *See id.*

   The *Cottrell* court specifically held that the "serious questions" test remains valid post-*Winter*. *See id.* at 1139.  As such, parties seeking a preliminary injunction in this circuit must now "meet one of two variants of the same standard." *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).  Either a plaintiff may satisfy the traditional *Winter* standard, or, the plaintiff may satisfy the "sliding scale" variant of the *Winter* standard which states that "if a plaintiff can only show that there are serious questions going to the merits . . . then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor and the other two *Winter* factors are satisfied." *Id.* (emphasis in original) (citations omitted).  "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus

for more deliberative investigation.'" *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (citations omitted).

The "sliding scale" approach that Qualcomm is advocating for does not find support in *Cottrell*.  Although *Cottrell* did recognize, in dicta, that the Ninth Circuit's "sliding scale" standard generally allowed for a strong showing on one element to offset a weaker showing on another, the *Cottrell* court only held that one variant of the sliding scale standard — that is, the "serious questions" test — survived *Winter*.  Qualcomm, therefore, does not stand on solid ground when it asserts that it is nonetheless appropriate to award preliminary relief when there is only some likelihood of irreparable harm, but a stronger showing of a likelihood of success on the merits.

In fact, neither of the cases relied upon by Qualcomm stand for the proposition that the Ninth Circuit's sliding scale approach tips the other way, that is, when there is a lesser showing of irreparable harm and a stronger likelihood of success on the merits.  *See Greater Yellowstone Coal. v. Timchak*, 323 F. App'x 512, 514 n.1 (9th Cir. 2009) (recognizing that the "sliding scale" approach likely survived *Winter* but declining "to define the sliding-scale formulation's precise post-*Winter* contours"); *see Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (citing to *Cottrell* in evaluating a noncitizen's request to stay removal pending adjudication on petition for review).  Indeed, it is not surprising that Qualcomm has failed to produce a case holding that only "some likelihood of irreparable harm" may be shown where there is a high likelihood of success on the merits, as it is entirely unclear how "some" likelihood of irreparable harm (or any "lesser" showing) is any different from the mere "possibility" of irreparable harm rejected by *Winter*.  Accordingly, the Court rejects Qualcomm's assertion that it only needs to demonstrate "some" "lesser" showing of  irreparable harm.  An unqualified likelihood of irreparable harm is required.

### 2.  Mandatory injunctions

The Contract Manufacturers, and Apple, argue that a heightened standard applies to Qualcomm's request for a preliminary injunction because Qualcomm seeks a

mandatory injunction.  Mandatory injunctions, the CMs argue, are disfavored in this circuit because they compel a party to take action and, therefore, should not be granted unless "extreme or very serious damage will result."  Dkt. No. 72 at 20.  Qualcomm contests that it has requested a mandatory injunction.  Dkt. No. 100 at 9-11.

When a party requests a "mandatory injunction" the standard is "doubly demanding."  *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  In such a case, it is not enough for the movant to demonstrate that he or she is likely to succeed, but rather, the movant must show that "the law and facts *clearly favor* her position."  *Id.* (emphasis in original).  The *Google* court describes a mandatory injunction as one that requests the responsible party to take affirmative action.  *Id.*  The *Google* court goes on to explain that a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored."  *Id.* (quotations and brackets omitted).

Accordingly, whether or not Qualcomm has requested a mandatory or prohibitory injunction depends upon what the Court construes as the status quo.  The status quo refers to the last uncontested status which preceded the pending controversy.  *N.D. ex rel. Parents v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010).  Put differently, the status quo refers to the "legally relevant relationship between the parties before the controversy arose."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (emphasis removed).

As it turns out, deciphering the "last uncontested status" or the last "legally relevant relationship" between the parties before this dispute arose is no straightforward task.  A complex weave of contractual agreements govern the parties' legal relationships, and the royalty payments in particular, and reasonable minds can differ over where to fix the status quo.  Qualcomm, of course, wants the Court to find that the status quo reverts back to when Apple and the Contract Manufacturers were making timely royalty payments.  The CMs and Apple, by contrast, want the Court to conclude that the appropriate status quo relates back to when Apple, and the CMs, stopped making royalty payments in response to Qualcomm's failure to rebate royalties under the BCPA.

The Court, however, need not settle this disagreement because Qualcomm's request for a preliminary injunction fails even under the less demanding, traditional preliminary injunction standard articulated in *Winter*. It is, therefore, unnecessary to determine whether the "doubly demanding" standard reserved for mandatory injunctions applies.

### B. Irreparable harm and the adequacy of legal remedies

Notwithstanding Qualcomm's arguments to the contrary, the Court is not persuaded that the monetary harm posed by Defendants' non-payment of royalties passes the threshold of irreparable injury. As the Supreme Court has stated, "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (addressing irreparable harm in context of stay) (internal citations omitted). For this reason, "monetary injury is not normally considered irreparable" in the context of a preliminary injunction. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

Qualcomm nonetheless argues that it has rebutted the presumption that monetary damages are not "normally considered irreparable." Specifically, Qualcomm contends that it is "virtually certain to suffer immense irreparable harm" because it faces: (1) "ongoing, indefinite non-payment of very large amounts of royalties"; (2) "injury to Qualcomm's core licensing business, and loss of goodwill among other licensees that also make smartphones"; (3) loss of research and development opportunities; and (4) "potential difficulties in collecting future damages" due to the fact that Defendants are foreign companies. Dkt. No. 35-1 at 21, 27.

Yet for the reasons that follow, the Court is unconvinced that any of these contentions demonstrate that Qualcomm faces a likelihood of irreparable harm in the absence of preliminary relief. Preliminary injunctive relief is justified only when a court

1    cannot make a plaintiff whole after an adjudication on the merits.  Accordingly, and

2    because Qualcomm has failed to demonstrate that the remedies this Court can afford

3    upon conclusion of these proceedings are insufficient, the Court is not convinced that

4    there is any likelihood that Qualcomm will suffer irreparable injury while litigation is

5    pending.

6          **1.  "Ongoing, indefinite non-payment" of royalties**

7          First, Qualcomm stresses that it has shown irreparable harm because Defendants'

8    alleged misconduct "could continue indefinitely[.]"  Dkt. No. 35-1 at 21.  Unlike in a

9    normal breach of contract case, Qualcomm asserts, where an entity can "terminate its

10   license agreement if a licensee refuses to pay royalties," here, █████████████

11   ██████████████████████████████████████████████████████

12   ███████████████████████████  Dkt. No. 133 at 22 (under seal)

13   Accordingly and because Defendants "plainly intend to continue breaching the license

14   agreements going forward," Qualcomm argues that it is left "with no recourse, other than

15   indefinite, multiple, serial lawsuits[.]"  Dkt. No. 35-1 at 22.  Qualcomm, therefore, seeks

16   a preliminary injunction in order to ensure that it does not "experience repeated

17   nonpayment of nearly ████████, on average, every calendar quarter into the indefinite

18   future."  Dkt. No. 133 at 22 (under seal).

19         This irreparable harm argument, however, is flawed because it is untethered to any

20   discussion of the adequacy of legal remedies.  "The basis of injunctive relief in the

21   federal courts is irreparable harm *and* inadequacy of legal remedies."  *L.A. Mem'l*

22   *Coliseum*, 634 F.2d at 1202 (emphasis supplied).  An injury is not irreparable if it can be

23   compensated by the court when, and if, the plaintiff prevails on the merits.  *Id.*  Stated

24   differently, "only harm that the district court cannot remedy following a final

25   determination on the merits may constitute irreparable harm."  *Metro-Goldwyn-Mayer*

26   *Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1211 (C.D. Cal. 2007) (internal

27   citations omitted).

28

1    Qualcomm argues that it will be irreparably harmed by Defendants' continuing

2    breach of their license agreements.  It emphasizes that the STA ███████████████

3    █████████████████████████████████  Consequently, Qualcomm asserts, it

4    is in an "untenable position" because "Qualcomm is receiving no compensation for

5    Defendants' and Apple's [licensed] use of its intellectual property."  Dkt. No. 35-1 at 9,

6    15 (brackets added).  It follows, therefore and according to Qualcomm, that if the Court

7    does not order the Contract Manufacturers to comply with their license agreements,

8    Qualcomm will be left with no remedy other than to seek damages every quarter the

9    Defendants fail to pay their royalties.

10    Although neither Apple nor the Contract Manufacturers briefed what, if any, effect

11    the STA — a contract executed by Qualcomm and Apple — should have on the equitable

12    remedies available to Qualcomm here, there is little doubt that the STA affects the state

13    of play.  Qualcomm has raised valid questions regarding the impact of the STA on the

14    legal options available to Qualcomm.  Indeed, should the Court eventually hold that the

15    disputed royalty provisions are enforceable, the Court would necessarily consider

16    whether an award of only monetary damages would provide an adequate remedy in light

17    of the STA and the threat of continued breach.

18    What Qualcomm's argument fails to demonstrate, however, is why Qualcomm

19    faces a likelihood of irreparable harm if the Court does not grant preliminary injunctive

20    relief now as opposed to permanent injunctive relief at the conclusion of trial.  "[T]he

21    only injury that counts is injury that cannot be prevented after a more complete hearing at

22    the next stage of litigation."  Douglas Laycock, *The Death of The Irreparable Injury*

23    *Rule*, 103 Harv. L. Rev. 687, 729 (1990).

24    Qualcomm asserts that other courts have found irreparable harm where the nature

25    of the defendant's misconduct threatens to burden the plaintiff with continuous breach.

26    In trespass cases, for example, there is a possibility that the "constant recurrence" of

27    trespassing can render the remedy at law inadequate because every subsequent trespass

28    will require a separate enforcement action.  *See Donahue Schriber Realty Grp., Inc. v. Nu*

*Creation Outreach*, 181 Cal. Rptr. 3d 577, 587 (Cal. Ct. App. 2014).  Likewise, in copyright infringement cases, there is a formidable risk that, absent a preliminary injunction, a plaintiff will have to file multiple lawsuits every time an infringing act occurs.  *See Grokster*, 518 F. Supp. 2d at 1219 ("Indeed, the very need to file multiple lawsuits as a consequence of Streamcast's inducement [of infringement] is itself supportive of an irreparable harm finding."); *see also Louis Vuitton Malletier, S.A. v. Akonoc Sols., Inc.*, 2010 WL 5598337, *18 (N.D. Cal. Mar. 19, 2010) (citing *Grokster*).

But these concerns do not apply in this context.  The harm caused by continuous trespass or infringement stems not from the fact that a defendant is continuously breaching, but from the fact that a court's judgment cannot remedy that continuous breach.  Defendants who are repeat violators threaten a court's ability to render meaningful relief.  This is so because a defendant intent on trespassing on property or distributing copyrighted material will often not be deterred merely by the possibility that a court will find one of those many violations unlawful.  *See* Laycock, *Death of Irreparable Injury*, at 714-15 (stating that damages might not deter repeated violations and mounting litigation costs might deter plaintiff from suing before they deter defendant from violating the law).  Accordingly, and in the interest of ensuring that a court can provide meaningful relief, it may be necessary to enjoin repeated violations while a trial is pending.

This is not the case here.  The Contract Manufacturers and Apple are withholding royalty payments because they aver that the royalty provisions contained in the license agreements are unenforceable under FRAND and other anti-competition laws.  Thus, while it may be true that Defendants are currently engaged in "continuous breach," Qualcomm has given the Court no reason to conclude that it cannot remedy these breaches after a trial on the merits.  *See E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("Thus, even repeated and ongoing violations of a CBA [collective bargaining agreement] do not warrant a preliminary injunction if each violation may be remedied[.]").

3:17-cv-01010-GPC-MDD

If and when this Court holds that the Defendants' licensing provisions are enforceable, the Court will evaluate whether it is proper to grant permanent injunctive relief, *e.g.*, specific performance, or damages. *See Tamarind Lithography Workshop, Inc. v. Sanders*, 193 Cal. Rptr. 409, 412-13 (Cal. Ct. App. 1983) (finding specific performance appropriate where there is risk of continuous breach of contract). Yet that specific performance may be an appropriate remedy at the conclusion of trial does not mean that it is necessary to compel specific performance now, before the merits of the case have been heard. *See Sampson*, 415 U.S. at 90 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Qualcomm has offered no persuasive rationale why the legal remedies available to it at the conclusion of trial will not be sufficient to make it whole. Accordingly, the Court declines to find that a likelihood of irreparable harm may be demonstrated merely by pointing out that the Defendants' breaches are ongoing.

## 2. Injury to Qualcomm's core licensing business, reputation, and loss of goodwill among other licensees

The "essence" of Qualcomm's business involves inventing cellular technologies, patenting them, and licensing those patents to cellular device manufacturers. Dkt. No. 35-1 at 24. As such, Qualcomm avers, any misconduct that adversely affects the integrity of Qualcomm's business relationships with its licensees irreparably harms Qualcomm's reputation, core business, and goodwill. *See id.*

The Court is well aware that damage to a plaintiff's reputation, goodwill, and core business can be enough to demonstrate a likelihood of irreparable harm. As Qualcomm points out, courts often take such adverse effects into consideration when deciding whether to enjoin a defendant in copyright or patent infringement cases.

A copyright plaintiff, for instance, may establish irreparable harm by demonstrating that, without a preliminary injunction, a defendant's infringement will exponentially dilute the exclusivity of plaintiff's copyright while awaiting a trial on the

3:17-cv-01010-GPC-MDD

merits.  *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011) (granting preliminary injunction and concluding that defendant's infringement on plaintiff's copyright threatened to irreparably harm plaintiff's relationships with licensees who distribute plaintiff's copyright); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) ("if Defendants can transmit Plaintiffs' content without paying a fee, Plaintiffs' existing and prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives, and may push additional players away from license-fee paying technologies and toward free technologies like Defendants'."); *Hand v. Nail Harmony, Inc. v. ABC Nail & Spa Prods.*, 2016 WL 3545524, *7 (C.D. Cal. June 28, 2016) (granting preliminary injunction and finding that defendants' counterfeiting activities diminished the value of plaintiffs' distributorships and encouraged plaintiffs' customers to carry and distribute other branded products).

A plaintiff may also demonstrate the requisite likelihood of irreparable harm by showing that the defendant's breach of contract will erode at the plaintiff's customer base while a full adjudication is pending.  *See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 396-402 (D. Md. 2007) (granting preliminary injunction where plaintiff and defendant were direct competitors and defendants' breach of non-compete clause was infringing on plaintiff's customer base).  And finally, a court may also find irreparable harm where a plaintiff shows that a defendant's continuing, infringing activities preclude the patent holder from licensing their invention while awaiting an adjudication on the merits.  *See Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1273 (Fed. Cir. 1985); *see also Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 604-07 (E.D. Tex. 2007) (granting permanent injunction because defendants' infringement of plaintiff's patent prevented plaintiff, whose business relied on licensing patents and not practicing them, from being able to license its intellectual property).

Qualcomm points to these, and other, cases as support for its contention that Defendants' breach can and will cause Qualcomm irreparable harm.  Yet that loss of

reputation, customer goodwill, and core business may, under certain circumstances, be sufficient to demonstrate irreparable harm (in the absence of a preliminary injunction), does not mean that such reasons are sufficient in all cases.  Each of the cases cited by Qualcomm had a plausible theory of irreparable harm that led the court to conclude that the plaintiff would endure irrevocable injury without preliminary relief from the court. Qualcomm's theories of irreparable harm here, however, are not plausible and are not otherwise supported by the record before the Court.

Apart from citing to dicta and generalities in the above-mentioned cases, Qualcomm offers two main reasons why Defendants' non-payment of royalties will irreversibly affect Qualcomm's reputation, customer goodwill, and licensing business. First, it argues that it will lose goodwill among its licensees because Defendants, and Apple, have "improperly secured" more favorable terms under their license agreements (the "goodwill argument").  Second, it contends that Defendants' breach will cause irreparable harm by emboldening other licensees to improperly seek to breach or renegotiate their licensing agreements (the "contagion argument").  For the following reasons, the Court finds neither of these arguments convincing.

### a. Goodwill argument

Qualcomm contends that Defendants' breaches threaten to irreparably harm Qualcomm's goodwill with its licensees because their non-payment means that they are being treated more favorably than Qualcomm's other licensees.  Dkt. No. 35-1 at 24 ("Qualcomm strives to treat similarly situated licensees fairly and to maintain consistency in its licensing program. Without a preliminary injunction, Defendants, under the direction of Apple, threaten to undo that work.").  As such, the argument goes, Defendants' non-payment of royalties will lead to irreparable customer dissatisfaction.

This line of argument is perplexing to the Court.  Qualcomm is not treating Apple or the Contract Manufacturers more favorably than its other customers.  Apple and the Contract Manufacturers have unilaterally stopped paying royalties because they have sued Qualcomm over the enforceability of Qualcomm's licensing provisions.  Qualcomm

1   has not offered the Contract Manufacturers more favorable terms.  Qualcomm has not

2   agreed to more favorable terms.  As such, the Court finds it implausible that the Contract

3   Manufacturers' temporary non-payment of royalties will irrevocably undo Qualcomm's

4   relationships with its other licensees.

5           Moreover and more importantly, even if this Court were to conclude that such a

6   theory of harm is plausible, the Court would not find that it contributes to any finding of

7   irreparable harm, here, because Qualcomm has made no particularized showing

8   demonstrating that Qualcomm's goodwill with its licensees is likely to be irrevocably lost

9   in this way.  Qualcomm's goodwill argument relies exclusively on no more than two

10   paragraphs in a declaration submitted by Alex Rogers, the executive Vice President and

11   President of Qualcomm Technology Licensing.  *See* Rogers Decl. ¶¶ 8-9, Dkt. No. 35-4

12   at 3-4 (stating in part "Qualcomm has spent decades in relationships with numerous

13   licensees around the world.  In order to develop goodwill Qualcomm strives to treat

14   similarly situated licensees fairly and maintain consistency in its licensing program.").

15   Such conclusory assertions about the importance of goodwill to Qualcomm's enterprise

16   are not enough to demonstrate that it is likely to be irreparably harmed by the loss of

17   goodwill caused by the Contract Manufacturers' non-payment of royalties.  *See Goldie's*

18   *Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)

19   (stating that district court erred by finding that plaintiff would lose customer goodwill

20   when plaintiff's argument was "not based on any factual allegations" and was

21   "speculative").   Accordingly, the court rejects Qualcomm's goodwill argument.

### b.  Contagion argument

23           Relatedly, Qualcomm next argues that Defendants' actions threaten Qualcomm's

24   business relationships with its licensees because "other licensees may use Defendants'

25   non-payment as leverage" to either not pay royalties or renegotiate their contracts.  Dkt.

26   No. 35-1 at 24.  Indeed, in its reply brief, Qualcomm asserts that ██████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████

█████████████████████████  Dkt. No. 137 at 21 (filed under seal).  While the Court finds this theory of irreparable harm more plausible than the goodwill theory, the Court is likewise unpersuaded that such a threat of harm justifies the equitable relief that Qualcomm seeks.

As an initial matter, the law of contract governs Qualcomm's relationships with its licensees, as is the case with the Contract Manufacturers.  If other licensees similarly choose to stop performing under their license agreements (*i.e.*, stop paying royalties) they will expose themselves to liability for damages.  That Qualcomm has a legal remedy against a non-paying licensee lessens, if not extinguishes, the likelihood that any non-payment of royalties owed by another licensee would or should constitute irreparable harm.

Yet more importantly, Qualcomm has failed to make a sufficient evidentiary showing to buttress its assertion that "other licensees may use Defendants' non-payment as leverage" to either not pay royalties or renegotiate their contracts.  Qualcomm's contagion argument is grounded in the declaration of Alex Rogers.  The Rogers declaration, however, is remarkably general and speculative.  Rogers Decl. ¶ 10, Dkt. No. 35-4 at 4 ("If Defendants' non-payment of royalties continues, other licensees may use Defendants' non-payment as leverage to improperly argue that they may also decline to pay under their respective agreements, or use the non-payment as leverage in renegotiations, so long as Apple and Defendants continue to refuse to pay."); *id.* ¶ 11 ("Defendants' continued non-payment of royalties also may harm Qualcomm's ability to enter into new agreements.  Prospective licensees are aware of competitors' practices . . . .  If a major competitor is not paying at all . . . a prospective licensee could claim it is disadvantageous to sign a license agreement with Qualcomm.").  But as stated above, such speculative and general assertions do not constitute the factual basis needed to support an irreparable harm finding.  *See Goldie's Bookstore*, 739 F.2d at 472 (stating that district court erred by finding that plaintiff faced likelihood of irreparable harm when supporting statement was "not based on any factual allegations" and was "speculative").

Qualcomm's evidentiary showing becomes even less weighty in light of other facts contained within the record.  For instance, during Qualcomm's Q3 2017 earnings call to the investing public, the president of Qualcomm, Derek Aberle, specifically assured stockholders that there was no indication that the Contract Manufacturers' failure to make royalty payments would influence others to do the same.  *See* Exhibit 39, Lavely Reply Decl., Dkt. No. 100-2 at 194 ("I think on the question of contagion . . . I don't think, as we sit here, we have any indication that this is somehow going to result in a bunch of other licensees deciding not to report and pay royalties."); *see also id.* ("[W]e've had disputes with licensees, large and small, going back all the way to even with Nokia where they had 40% to 50% of the market and were not paying us for a period of time. And that did not translate into our other licensees stopping payment.").  In fact, when an analyst asked a question suggesting that such contagion was happening, Aberle emphatically disagreed and said "No. That's not what's happening. We have a dispute with Apple and their contract manufacturers, and we have a dispute with one other licensee." *Id.* at 195. That Qualcomm's own president has stated to the investing public that he does not believe that there is any merit to the contagion argument belies the plausibility and credibility of the argument made to the Court.  Consequently, the Court concludes that Qualcomm has failed to show, based upon the record before the Court, that it faces any likelihood of irreparable harm flowing from the contagion effect.

Furthermore, the Court concludes that Qualcomm's argument in its reply brief that "one significant licensee" has, in fact, "underpaid the royalties it owed to Qualcomm under its license agreement" does not alter this conclusion.  *See* Rogers Reply Decl. ¶¶ 6-7, Dkt. No. 100-3 at 4.  For one, Qualcomm's own declaration demonstrates that ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*See id.*, Dkt. No. 137 at 4 (under seal).  And two, the referenced licensee stopped making payments to Qualcomm before President Aberle's July 19, 2017 statement, wherein Aberle specifically dismissed the significance of that licensee's actions.  *See* Lavely

1   Reply Decl. ¶¶ 6-8, Dkt. No. 102; *see also* Qualcomm's Letter, August 18, 2017, Dkt.

2   No. 126-1 (clarifying that the other licensee "had stopped paying prior to Mr. Aberle's

3   remarks in July.").  Accordingly, the Court's conclusion remains unaltered and

4   Qualcomm's contagion argument fails to carry any weight.

5       **3.  Lost research and development opportunities**

6       Loss of research and development opportunities may also result in irreparable

7   injury and warrant preliminary injunctive relief.  *See, e.g.*, *Buffalo Tech.*, 492 F. Supp. 2d

8   at 603 (delays in research can result in competitive disadvantage that cannot be

9   compensated with damages); *Vanda Pharm. Inc. v. Roxane Labs., Inc.*, 203 F. Supp. 3d

10  412, 435 (D. Del. 2016) (finding that lost research and development funds, among other

11  factors, were irreparable harms calling for a preliminary injunction).  Thus, Qualcomm

12  argues, it faces a likelihood of irreparable harm because Defendants' non-payment of ▮

13  ▮▮▮▮▮▮ in royalties each year will adversely affect Qualcomm's ability to invest in

14  research and development.  Dkt. No. 137 at 23 ("the impact of withholding nearly ▮

15  ▮▮▮▮▮ from a company that spends $5 billion per year on R&D (more than 20%

16  of its revenue) is obvious.") (under seal).

17      That Qualcomm asserts that the harm flowing from lost research and development

18  opportunities is "obvious" belies the strength of its argument.  Notwithstanding

19  Qualcomm's contentions to the contrary, Qualcomm has offered nothing but conclusory

20  assertions regarding the effect of Defendants' breaches on their research and

21  development program.  Notably, the declaration of Alex Rogers dedicates just one

22  paragraph to the issue.  Rogers Decl. ¶ 7, Dkt. No. 35-1 at 3. ("In order to remain a leader

23  in the industry, it is essential for Qualcomm to commit significant resources and funding

24  to R&D of new technologies.  This is especially true given the changing landscape of

25  companies seeking to innovate in the field of wireless technology.  It is Qualcomm's

26  ongoing investment in R&D that allows it to invent the cellular technologies critical to

27  the function of cellular networks and devices.").  Conclusory assertions, however and as

28  stated above, are not an enough to support a finding of irreparable harm.  *See Oakland*

*Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (faulting plaintiff for not providing any evidence in support of its irreparable injury argument); *Am. Passage Media Corp. v. Cass Commc'ns Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("We can think of a myriad of examples of the type of evidence necessary to bolster a finding of irreparable harm under these circumstances.  We search the record in vain for that evidence."); *Goldie's Bookstore*, 739 F.2d at 472 (disregarding irreparable injury argument because it was "not based on any factual allegations" and was therefore "speculative); *see also L.A. Mem'l Coliseum*, 634 F.2d at 1202-03.

What is more, Qualcomm's evidentiary assertions regarding lost research and development opportunities are not only lacking, but they are overwhelming contradicted by the record before the Court.  During the quarterly earnings call that took place on July 19, 2017, just two months after the instant motion was filed, Steven Mollenkopf, Qualcomm's CEO and Director, assured investors that the company was still poised to "invest ahead of the industry."  Exhibit 39, Lavely Reply Decl., Dkt. No. 100-2 at 185 ("Our breadth of technologies and products continues to benefit from our ongoing strategy to invest ahead of the industry."); *see also id.* at 184 ("Despite the near-term financial impact to our business by the actions of a small number of powerful industry players, the long-term outlook for our licensing business continues to remain strong . . . . And for many years to come, the licensing business will continue to be a significant revenue and profitability generator for the company longer term.").  And during a Q2 fiscal earnings presentation held on April 19, 2017, just a month prior to this motion being filed, Qualcomm stated that "We will continue to protect the value of our technologies, which enables today's robust mobile communications ecosystem, and invest in R&D that will drive the leading edge of mobile computing and connectivity for decades to come[.]"  Exhibit 4, Lo Decl., Dkt. No. 72-2 at 54.  That Qualcomm made such assurances to its shareholders immediately before and after this motion was filed, weighs heavily against any finding that Defendants' non-payment of royalties will have

an irreparable effect on Qualcomm's research and development activities while litigation is pending.

Lastly, the Court will address an assertion made for the first time during this Court's August 18, 2017 hearing.  At oral argument, Qualcomm claimed for the first time that the Contract Manufacturers' non-payment of royalties will specifically affect Qualcomm's ability to contribute to the pending 5G standard.  Transcript of August 18, 2017 Hearing, Dkt. No. 127 at 18.  The Court observes, however, that this assertion is wholly unsupported by Qualcomm's evidentiary submissions to the Court.  The declaration of Alex Rogers, which is the only declaration cited to support Qualcomm's contentions regarding research and development, does not mention 5G whatsoever.  The Court, therefore, will not conclude that Qualcomm faces a likelihood of irreparable harm caused by lost opportunities for researching and developing the 5G standard.

In sum, and absent a particularized evidentiary showing demonstrating that Defendants' withholdings are likely to have an irreversible effect on research and development, the Court declines to find that Defendants' breach is likely to cause irreparable harm in the absence of a preliminary injunction.  *See Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) ("If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparable harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive relief."); *see also Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) ("An investor could always claim that she could put money to better use than simply letting it accrue interest at the prevailing rate.  An asserted injury so ubiquitous cannot serve as the basis for the issuance of a preliminary injunction. . . . Rather, if a claim of irreparable injury tied to outperforming the market could ever be recognized, it could only be on the basis of a substantial evidentiary showing.").

/ / / /

/ / / /

### 4. Potential difficulties in collecting future damages

Finally, Qualcomm contends that "settled U.S. law" states that "the difficulty of pursuing collection of [a damages] award in international legal systems" is sufficient on its own to show irreparable harm.  Dkt. No. 100 at 24; Dkt. No. 35-1 at 29.  As such, Qualcomm argues that it faces a likelihood of irreparable injury because Defendants are non-U.S. companies with primary assets located overseas.  Dkt. No. 35-1 at 29.

As an initial matter, three citations to three unpublished sources do not establish "settled law" in this or any other circuit.  *See Pharmacia & Upjohn Co. v. Ranxbury Pharm., Inc.*, 85 F. App'x 205, 214-15 (Fed. Cir. 2003) (observing that the district court was entitled to consider "the difficulty of pursuing collection" of a damages award in "international legal systems" as factor weighing in favor of irreparable harm); *see also Cordelia Lighting, Inc. v. Zhejiang Yankon Grp. Co.*, 2015 WL 12656241, *7 (C.D. Cal. Apr. 27, 2015); *Aevoe Corp. v. Shenzhen Membrane Precise Electron Ltd.*, 2012 WL 1532308, *5-6 (D. Nev. May 1, 2012).

Yet even if Qualcomm had cited to cases that were binding or persuasive authority in this circuit, the Court would still decline to find that such a consideration weighs in favor of granting preliminary injunctive relief.  The defendants in *Cordelia Lighting* and *Aevoe*, unlike Defendants and Apple, had no legal or business relationship with the plaintiff.  *See Cordelia Lighting*, 2015 WL 12656241, at *1 (plaintiff held patent for "heat-dissipating LED light fixture" and defendants sold allegedly infringing products); *Aevoe*, 2012 WL 1532308, at *1 (defendant manufactured and sold screen protectors for electronic devices and plaintiff owned the patent for touch screen protectors).  The *Cordelia Lighting* and *Aevoe* defendants also lacked any subsidiaries or substantial assets in the United States.  *Cordelia Lighting*, 2015 WL 12656241, at *9; *Aevoe*, 2012 WL 1532308, at *5.  By contrast, here, the parties have extensive and sophisticated business relationships that belie any uncertainty regarding the collection of damages.  Each of the Defendants has subsidiaries in the United States and each has been indemnified by Apple for any damages owing to Qualcomm under the license agreements.  Each Defendant is

also bound by Taiwanese law, which explicitly recognizes the validity of foreign judgments. Dkt. No. 72 at 29 ("Each Defendant is headquartered in Taiwan, which has an explicit statutory provision [Taiwan Code of Civil Procedure Article 402] that recognizes foreign judgments."). Accordingly and in light of these distinctions, the Court declines to conclude that the mere fact that Defendants are foreign entities, and that it may theoretically be difficult to enforce a judgment, are reasons alone to find that Qualcomm is likely to face irreparable harm.

### C. The remaining *Winter* factors

Notwithstanding Qualcomm's insistence that the remaining *Winter* factors decidedly weigh in its favor, the Court is also unconvinced that any of the three additional *Winter* factors warrant granting preliminary relief. In an effort to make the equities appear in the light most favorable to Qualcomm, Qualcomm has oversimplified the legal issues before the Court. Yet upon close inspection of the competing claims of the likelihood of success on the merits, the balance of hardships, and the public interest, the Court concludes that the outstanding three *Winter* factors do not weigh in favor of a preliminary injunction either.

With regards to the likelihood of success on the merits, Qualcomm contends that it is "highly likely to succeed on the merits of its claims" because there is no dispute that it has a valid license agreement with each of the Contract Manufacturers or that the Contract Manufacturers deliberately withheld royalty payments under the license agreements. Dkt. No. 35-1 at 17-18.

This assertion, however, fails to persuade because it is one-sided. Qualcomm would have the Court conclude that the only merits questions presented by this lawsuit are Qualcomm's claims of breach. But that is simply not the case. The Contract Manufacturers' have asserted a number of valid defenses and counterclaims, which include allegations that Qualcomm has breached the parties' license agreements, breached its FRAND commitment, and that Qualcomm has placed anticompetitive provisions in their licensing agreements and otherwise caused harm to competition and

customers in the cellular industry.  *See generally* CM's Answer & Defenses; Counterclaims, Dkt. No. 84.  Qualcomm's motion, however, is completely silent as to these claims.  In reply, Qualcomm responds to the merits of some of the Contract Manufacturers' allegations, but in the Court's view, the reply arguments are too cursory and overstated to demonstrate that Qualcomm is nonetheless likely to succeed on the merits.[2]  Dkt. No. 100 at 13-17.

Qualcomm's assertions regarding the balance of hardships and public interest similarly ignore the validity of the Contract Manufacturers' defenses and counterclaims.  According to Qualcomm, it is simply asking the Court to order Defendants to comply with their licensing contracts just as they have been doing for years.  Dkt. No. 35-1 at 29.  Thus, Qualcomm argues, the CMs do not face any risk of harm.  *See id.*  Such a contention, however, is undermined by the allegations in Defendants' countersuit.  Defendants argue that Qualcomm's business model, including its licensing agreements and chipset practices, have anticompetitive consequences on the CMs and on the cellular telecommunications market at large.  Specifically, Defendants argue that they have been and continue to be financially injured by Qualcomm's unfair and anticompetitive royalty charges.  *See* CM's Prayer for Relief, Dkt. No. 84 at 262-66.  Because these allegations are "competing claims of injury," the Court is required to consider them when assessing the propriety of a preliminary injunction.  *See Winter*, 555 U.S. at 24.  Accordingly, the Court disagrees that Qualcomm is the only party facing hardship.  Granting Qualcomm the relief that it seeks would effectively require the Contract Manufacturers to make royalty payments that they dispute as illegal and anticompetitive.  The Court therefore finds that, at most, the parties' competing claims of hardship are in equipoise.

_____

[2] For instance, in its reply brief, Qualcomm assertively argues that FRAND, as a matter of law, "is not a valid basis for abrogating an existing license agreement." *Id.* at 13-14.  Yet the only legal support that Qualcomm cites for this position is a single decision by a British court.  Such attempts to pass off legal issues as "settled" when there is no binding authority to support the proposition, do not convince the Court that Qualcomm is likely to succeed on the merits.

The Court likewise concludes that the competing claims of public interest are also in equipoise.  Qualcomm asserts that a preliminary injunction would serve the public interest by protecting intellectual property rights.  Dkt. No. 35-1 at 30.  Defendants counter that a preliminary injunction would injure the public's strong interest in the preservation of market competition.  Dkt. No. 72 at 35.  Qualcomm would have this Court conclude that the public's interest in protecting intellectual property rights trumps the public interest in market competition.  Such a finding, however, is inappropriate at this juncture.  Both parties offer valid points and as this case proceeds, the Court will be in the position to evaluate these competing positions.  But in the meantime, the Court is not prepared to conclude that the public interest weighs in favor of a preliminary injunction.  As such, the Court rejects Qualcomm's argument.

## V. CONCLUSION

The stakes presented by this lawsuit are towering.  Qualcomm has sued to enforce license agreements that entitle it to billions of dollar in royalties for products incorporating its intellectual property.  The Contract Manufacturers, on the other hand, have sued to prevent Qualcomm from continuing to profit from their allegedly illegal business model and from continuing to inflict anticompetitive harm on the telecommunications industry.  These opposing claims present complex and novel legal issues that the Court will deliberately and expeditiously address as this litigation unfolds.

But the present issue before the Court is distinct.  By bringing this motion for preliminary injunction, Qualcomm has asked the Court to take the extraordinary step of granting Qualcomm relief before the Court has had the opportunity to make a decision on the merits.  Yet the Court is not convinced that such extraordinary and equitable relief is warranted given the facts before it.  Qualcomm has failed to demonstrate that it faces a likelihood of irreparable harm that cannot be remedied by this Court's adjudication on the merits.  Qualcomm has also failed to demonstrate that the remaining *Winter* factors apply.  For these reasons, the Court **DENIES** Qualcomm's motion for preliminary injunction.

1     **IT IS SO ORDERED.**

2

3  Dated:  September 7, 2017

4                                   Hon. Gonzalo P. Curiel

5                                   United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28